**Victor LASKY, Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., Defendant.**

**No. 83 Civ. 7438.**

United States District Court, S.D. New York.

March 5, 1986.

---

**2.** *Black's Law Dictionary* 126–27 (5th ed. 1979).

See also, 656 F.Supp. 934.

Kathleen McGuan, Leonard & McGuan, Washington, D.C., for plaintiff.

Floyd Abrams, Cahill, Gordon, & Reindel, New York City, for defendant.

## OPINION AND ORDER

WALKER, District Judge.

### I. PROCEDURAL BACKGROUND

The defendant in this libel action has moved for summary judgment pursuant to Fed.R.Civ.P. 56 on the sole ground that the plaintiff in his complaint has formulated a "strained and out-of-context interpretation of the ABC broadcast...." that is the subject of this action.[1] In essence, the defendant brings this motion on the same basis as an unsuccessful prior motion before Judge

---

1. Defendant's Memorandum of Law In Support of the Motion p. 3.

Lowe of this court under Fed.R.Civ.P. 12(b)(6) namely, that the complaint fails to state a claim upon which relief can be granted since the broadcast attributed to it by the plaintiff is not capable of a defamatory meaning.

 This court is not bound by Judge Lowe's prior decision. The law of the case doctrine is a discretionary doctrine which "does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided." *United States v. Birney*, 686 F.2d 102, 107 (2d Cir.1982) (quoting *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 134–136 (2d Cir.1956)). Thus, this court is free to ignore the previous ruling. Nonetheless, the end results of both motions are the same since this court, like Judge Lowe, holds that on its face the broadcast is capable of a defamatory meaning and that dismissal of the complaint is therefore unwarranted at this time.

## II. FACTS

On June 23, 1983, the defendant, American Broadcasting Companies, Inc. aired a one hour ABC News "Closeup" documentary entitled "The American Inquisition" which focused on the stories of two Americans caught up in the McCarthy era of the 1950's ("program" or "broadcast"). At the outset of the broadcast, the commentator, Marshall Frady, briefly described the McCarthy era and the nature of the program. He stated that the threat of Soviet Communism

> "set loose a national season of fear. Congressional hearings, spy trials, loyalty checks in companies, including broadcast networks, purges Hollywood [sic] and on campuses. Before it was over with, it left over America a wake of ruined lives. Tonight we'll return into that time, through the personal stories of two private citizens among the thousands of ordinary Americans also caught up in the McCarthy terror across the country.... Fear of them [American Com-

munists] spread, to engulf many citizens who were punished for their associations, for what they spoke, for what they thought, for their political stands." [2]

The first segment of the program focused on the story of Paul McCarty who was fired from his job after being wrongly accused of close involvement with Communists by two anonymous FBI informers. These accusations followed him from job to job and caused subsequent firings. McCarty stated that he "had no way of calling these informants to find out what they accused me of, or why, or anything about it." His former attorney, Theodore Jacobs, commented on the use of informants and what happened to McCarty: "It was basically the period of the bully, the big guy taking advantage of a small guy. And the little guy just didn't know very often what was happening to him. In this case he was overtaken by forces that he had no way of grappling with. He was a pretty simple man swept up in a political climate that he never dreamed of." The viewer could interpret the cause of McCarty's plight as either the hysteria of the times or the anonymous informant, the bully, who was able to wield great power in the political climate of the 1950's.

The second segment of the program and the subject of plaintiff's action related to the plight of Luella Mundel, an art teacher at Fairmont College in Fairmont, West Virginia. Frady introduced the second segment of the program, as follows:

FRADY: (voice over): The fear during the McCarthy era was of an alien conspiracy to overthrow our way of life. But that fear about Communism ranged beyond the politically suspect, became a campaign against all that seemed different, dangerous to Main Street America. This is the story of what McCarthyism did to the small town of Fairmont, West Virginia. In 1951 Luella Mundel was brought in to head the art department of the local state college. She was not a

2. Unless otherwise noted all quotations are from a transcript of the June 23, 1983 program and a correction aired on July 16, 1983 attached as Exhibit A to the complaint.

political activist, but had tastes, convictions about art, about religion, unfamiliar to these streets. And at a local American Legion seminar about subversives, she angrily stood to challenge what was being preached there. Her contract was dropped by the college. A state education official accused her of being a poor security risk. She then sued for slander, but in the trial that followed in Fairmont's courtroom, it was Luella Mundel and her right to speak freely, to be different, that wound up being tried.

This segment, like the McCarty segment, is divided into a number of audio and visual bites juxtaposed in a manner to tell a coherent story. A number of individuals made comments in these bites in response to interview questions, by reading from a prepared script, or through recordings, simulated or real, of their past remarks made during the 1950's. This cast of characters included: narrator Frady, Luella Mundel; Helen Whitney, the program's producer and the on-air interviewer; William Manchester, an historian who as a journalist in 1951 attended the Mundel trial in Fairmont; George and Madeline Hand, the former president of Fairmont College and his wife; Senator Joseph McCarthy; Newton Michael, Dominic Romino and Roderick Devison, three American Legionnaires in Fairmont; Senator Mansfield Neely, the defendant's attorney in the Mundel trial; Horace Meldahl, Mundel's attorney at the trial; Rev. Graham Luckenbill, a minister in Fairmont and observer of the Mundel trial; Samuel Cover and William Leeper, two jurors at the Mundel trial; Jeanne Barnitz, a friend of Mundel's in Fairmont; and Victor Lasky, reporter, syndicated columnist, lecturer, author and the plaintiff in this action.

Following Frady's introduction, the program continued with a brief sequence quoting parts of Meldahl's direct examination of Mundel at the slander trial, in which among other things she denied that the was a communist. The following exchange then took place:

Ms. MUNDEL (1983, in the Fairmont courtroom: voice-over): I can't remember much about Fairmont. I remember the courtroom. Bad vibes.

Ms. WHITNEY: Coming back here today, wasn't easy, was it?

Ms. MUNDEL: No, it's very unpleasant. It's an ordeal. My name is Luella Mundel and I was in this courtroom about 30 years ago, I had been accused of being a security risk and an atheist by the president of the school board, and as a result I lost my job. And so I decided to sue the president of the school board for slander. I didn't realize that the person who brought the suit would be the one who was on trial.

There then followed a series of recollections by a number of individuals. Historian William Manchester spoke about how "[p]eople were frightened [in 1951] and ... were looking for scapegoats ... [a]nd the person who is different, the individualist, is always vulnerable in scapegoating time." Madeleine Hand recalled Mundel's special vulnerability at that time because "she had different ideas than the people in the community" and because "[s]he did not hesitate to express her views...." Hand then stated that "it was so easy during that period to label anyone with different ideas a Communist. Just call them a Communist—it took in everything." George Hand stated that he hired Mundel to chair the art department because she was highly qualified. Madeleine Hand then recalled that

[i]t was Joe McCarthy's speech in Wheeling, West Virginia ... that set the stage for much that happened, all that happened later. And I think the thing that really started this hysteria was his waving this paper in his hand and saying "I hold here in my hand this list of subversive people." And it terrified people, it really did.... This to me was the beginning. And we wondered how long it would be before Fairmont would be part of his hysteria, and it wasn't long.... It was a terrible period waiting for the ax to fall. All of us had this sense of foreboding that it would soon envelop all of our lives, and it did, with this first-anti-

subversive meeting that was sponsored by the American Legion in Fairmont.

Two American Legionnaires, then recalled the anticommunist seminars held in those years and about how the American Legion would "bring guests in such as Mr. Lasky and other guests, and when they didn't have a guest, there were enough people here to talk about the subversives running around in our schools, and that they're teaching our kids foreign ideologies, and all of this put together is nibbling away at the moral fiber of America.... [T]hey get people fired up to where they're just stomping [and asking] '[w]here are these guys that we're mad at?' "

The next person to appear on the program was Victor Lasky. Lasky, Mundel and American Legionnaire Newton Michael recalled what occurred in 1951 at one of these American Legion seminars as follows:

VICTOR LASKY, journalist: Well, I gave my usual talk about the danger of Communist infiltration. I also took the approach that we could not get hysterical about this problem, that while there are witches, we should not engage in witch hunts. But I conceded there were witches.

Ms. MUNDEL: When I got there I thought some of the remarks were as-inine. For instance, some speaker referred to *The New York Times* as a pink sheet. I thought that was absurd and I think I said so. There were a number of other comments that were made that I think I challenged.

Mr. LASKY: All I know is that an hysterical woman got up and began to assail me or—and the rest of the speakers. And I had to respond to try to calm her down. If anything I was a calming influence. Believe me, she was hysterical.

NEWTON MICHAEL, American Legionnaire: As I recall, Mr. Lasky called her a Communist. This seemed to agitate her very much, and she called him a Nazi. And with that he became very, to me, very angry, and she became angry also.

Ms. MUNDEL: I don't like to be kicked around, and it was grossly unfair.

Devison, another American Legionnaire, then recalled of the Legionnaires that "if you want to start something, boy, that's the gang to get you started...." Devison and Manchester then commented on the plight of the nonconformist in Fairmont as follows:

Mr. DEVISON: [voice-over]: We had lots of shortcomings. Everybody knew everybody else's business—maybe that's how we got in trouble, with academia.

Mr. MANCHESTER: [voice-over]: People were confused. They didn't know what Communism was. It all became involved with atheism and attitudes toward casual sex, and the eccentric, the person who didn't quite fit, was singled out.

Mr. DEVISON: [voice-over]: The nonconformist better be nonconformist discreetly. It didn't pay then and I think it probably doesn't pay now to be too—if you are an eccentric, or if you do have different ideas, maybe you'd better keep them to yourself. If you're in the public life, especially, because in a small community other people make your business their business. Before the word gets around it's twisted to such an extent that you'd better be careful what you say, who you're seen with, what you do, and what you say. And that's still the bible. Unless you want to get in big trouble.

Mr. MANCHESTER: [voice-over]: What did Luella Mundel mean to these people of Fairmont? Well, they weren't quite sure about her religion—she didn't go to church, and Fairmont people did. And so it was assumed that she was an atheist. And that was bad. She painted surrealistic pictures—that was strange. And she spoke casually about sex, and that was wicked. She was a threat to Fairmont as it existed then.

After a commercial break, Manchester continued:

Mr. MANCHESTER: [voice over]: Tagged as a Red, she couldn't find a job anywhere. She was running out of mon-

ey. And in desperation she filed suit for slander against the woman who had called her a security risk, and that woman was to be represented by bible-thumping, flamboyant United States Senator Mansfield Neely of West Virginia.

The slander trial commenced by Mundel in 1951 was then recalled on the program by a number of people involved in the trial. Manchester recalled that Senator Neely, the defense attorney "was grim and threatening: he shouted; he wanted to know about her paintings and sex."

Mr. MANCHESTER: It turned out that Luella had described one of her paintings to a fellow faculty member, and then said with dry wit that it would make him masturbate. When the word masturbate was spoken in the courtroom, everybody froze. And then there was a woman in the third row who stood up clutching her galoshes and gave a little cry and ran out of the courtroom. It was probably the most damning word spoken in the trial.

The real test came when he talked to her about religion. He wanted to know if she believed in God. She said she believed in truth, that was what she worshipped. And she quoted Webster's Dictionary as supportive of her belief that this was religiosity. Neely wasn't having it. He wanted to know if she believed in the Supreme Being and God, and he said not one of those Buddhas that the Japs worshipped.

The Reverend Luckenbill stated that "Neely drove the woman [Mundel] into hysteria in the courtroom. She was hysterical, and he pounded and hounded at her and kept it up." (p. 9). Mundel broke under the pressure and that evening tried to commit suicide. The trial ended in a mistrial.

After the trial, Devison recalls that:

Mr. DEVISON: Academia was never the same up at Fairmont College after that for six or eight years. When it was all over with, all of the eccentrics had departed from the college one way or the other, and some of these other folks I think probably, at least subconsciously, pulled in their horns. And if they

thought something, they thought two or three times before they said it, even in their classes, because egads, they had a job, you know? And so they didn't want to be a sacrificial lamb, so things quieted down and you didn't hear very many people voicing their opinions, especially on sensitive subjects after that.

Mundel feared that she would never find another job and stated that after finding another position she lost that too because of what happened in Fairmont. Lasky then appeared on camera again and stated:

Mr. LASKY: I have no feeling one way or the other. I feel sorry for her. I feel sorry for her very much. I mean, I didn't have nothing to do with it. I didn't ask her to come to the meeting. I didn't ask her to shoot off her mouth. I have no idea why she was there. She was there with a claque and she rather enjoyed being Joan of Arc. I don't—I didn't set the fire to Joan of Arc.

Mundel then appeared and stated:

Ms. MUNDEL: I don't think this sort of thing promotes either patriotism or Christianity. I found the Christians to be un-Christian and those who purported to be 100% Americans were perhaps more totalitarian in their methods and beliefs.

Madeleine Hand then commented on what she learned from those events and stated: "A woman was being tried for her personal beliefs...."

The program concluded with the following written information being shown on the screen:

(silent) ... George Hand resigned as president of the college shortly after the trial. He and his wife Madeleine now live in Illinois.

... Jeanne Barnitz' husband resigned from the college faculty after the trial. He never returned to teaching.

... Luella Mundel taught art for 17 years at a college in North Dakota. She is now retired in California.

On July 16, 1983 during another ABC News Closeup program the following was aired:

MARSHALL FRADY: I'm Marshall Frady for ABC News Closeup. We have a correction to make involving our recent documentary called "The American Inquisition," about the legacy of the McCarthy era. In one segment, a participant recalled that at a public meeting, author Victor Lasky had called a West Virginia college professor, Luella Mundel, a Communist. While we did broadcast Mr. Lasky's general recollection of the meeting, we omitted his specific denial that he had called Ms. Mundel a Communist.

VICTOR LASKY: I did not label her a Communist. I never did. And I don't think she would have told you that I did, or did she? I never labeled her anything. I can't believe I would have labeled anyone 'cause I've never labeled anybody unless they were Communist.

FRADY: Based on information available about the incident which occurred in 1951, we believe we were unfair to Mr. Lasky. ABC News regrets the omission.

## III. DISCUSSION

The only issue before this court on defendant's motion for summary judgment is whether the Program is reasonably susceptible of a defamatory meaning. Under New York law, this is a threshold legal issue to be decided by the court rather than the jury. *Mencher v. Chesley*, 297 N.Y. 94, 75 N.E.2d 257 (1947); *Aronson v. Wiersma*, 65 N.Y.2d 592, 483 N.E.2d 1138, 493 N.Y.S.2d 1006 (1985). Moreover, the words must be construed in the context of the entire program, tested against the understanding of the average viewer, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction. *Mencher, supra.*

The defendant contends that the plaintiff's construction of the words as set forth in the complaint is strained. The plaintiff and the defendant have each offered what they believe to be a plausible construction of the program. If the program is ambiguous and capable of supporting several meanings, one of which is defamatory, it is for the jury to decide whether the defamatory meaning was, in fact, the one intended and understood. Thus, for the defendant to prevail on its motion, the court must find, that as a matter of law, that the program could not have had a defamatory meaning under any of one or more reasonable interpretations. *Katapodis v. Brooklyn Spectator*, 287 N.Y. 17, 38 N.E.2d 112, (1941). With these principles in mind, we move to an examination of the proffered constructions of the program.

### The Plaintiff's Construction

The plaintiff contends that the program falsely conveyed the meaning that Victor Lasky called Mundel a Communist at an American Legion seminar and thereby started the chain of events that led to her downfall including the cancellation of her teaching contract, the trial fiasco, her attempted suicide and her subsequent inability to find work.

The plaintiff first points to narrator Frady's introduction to the Mundel segment of the program which, in plaintiff's view, heightens a sense that there is a cause and effect relationship between the events at the American Legion seminar and her contract being dropped by the college since she was deemed a poor security risk. The pertinent portion of the narrator's introduction is as follows:

And at a local American Legion seminar about subversives, she angrily stood to challenge what was being preached there. Her contract was dropped by the college. A state education official accused her of being a poor security risk.

Plaintiff goes on to assert that the first half of the Mundel segment builds up to the Legion seminar which becomes the focal point of Luella Mundel's troubles. Madeleine Hand stated that before the seminar "she [Mundel] did not hesitate to express her views and it was so easy during that period to label anyone with different ideas a Communist. Just call them a Com-

munist—it took in everything." Plaintiff is then said, falsely, it is alleged, to have called her a Communist at the seminar. The program then portrays Mundel as having been "tagged as a Red" with the result that her life in Fairmont is destroyed. The second half of the story then depicts Mundel's downfall at the trial and afterward. ABC never names the woman whom Mundel sued for slander. In plaintiff's view, the sole purpose of the trial material is to portray Mundel as a "casualty." Once the audience understands that Mundel is a victim, according to plaintiff, Victor Lasky appears again, having presumably been asked off-camera if he feels responsible. Although Lasky denies feeling responsible, plaintiff maintains that the story line is clear—Lasky was responsible because he called Mundel a Communist and caused her to lose her job, lose a slander suit, and finally to try to kill herself.

### The Defendant's Construction

The defendant contends that the program makes clear that Mundel's downfall was not due to anything Lasky may or may not have said but because she was accused of being a security risk by a woman who headed the school board. The defendant argues that this is clear from the introduction to the Mundel segment which states that she was accused of being a poor security risk by a state education official, that she and her right to speak freely wound up being tried.

The defendant further supports its reading of the program by citing the statements made by Manchester after the commercial break. There, Manchester states: "Tagged as a Red, she couldn't find a job anywhere. She was running out of money. And in desperation she filed suit for slander against the woman who had called her a security risk...." This, according to the defendant, gives the viewer the clear impression that there is an absolute equation between the statement "tagged as a Red" and the woman who had called her a security risk. Her downfall resulted when she brought suit against this same woman.

### A Third Construction

Still another possible construction appears to this court. The program, taken as a whole, could reasonably convey the impression that Mundel was tagged as a Red, called a security risk, discharged from her job, and mentally broken at a trial because of the community perception of Mundel and her beliefs in Fairmont, West Virginia in 1951. Under this interpretation, the overall climate of fear and hysteria created in the McCarthy era caused a person, like Mundel, who was different and who held suspect views to be "tagged as a Red." Since the people looking for Communists in the McCarthy era were not quite sure what to look for, a person exhibiting such eccentric behavior was likely to be considered a Communist and this happened to Mundel.

This interpretation is supported first by the narrator's comments at the opening of the Mundel sequel where he stated: "She was not a political activist, but had tastes, convictions about art, about religion, unfamiliar to these streets." It receives further support in the trial segment where Mundel's different life-style was challenged by Neely and by the comments of Legionnaire Devison and Manchester, following the segment where Michael states that Lasky called Mundel a communist. Manchester stated that "[i]t [Communism] all became involved with atheism and attitudes toward casual sex, and the eccentric, the person who didn't quite fit, was singled out" and Devison stated that a "nonconformist better be nonconformist [sic] discreetly." [S]he was an atheist. And that was bad. She painted surrealistic pictures—that was strange. And she spoke casually about sex, and that was wicked. She was a threat to Fairmont as it existed then." It is following all of the foregoing that, after the commercial break, Manchester stated "Tagged as a Red, she couldn't find a job anywhere." Under this third interpretation, Mundel was "tagged as a Red", not by Lasky and not the head of the school board, but by her community because of her beliefs at a time when such beliefs were held to be subversive.

### The Defamatory Determination

In determining whether the Program is reasonably susceptible to a defamatory meaning, the court must consider the program as a whole. *Cianci v. New York Times Pub. Co.*, 639 F.2d 54, 60 (2d Cir. 1980), *O'Connell v. Press Pub. Co.*, 214 N.Y. 352, 358, 108 N.E. 556, 557 (1915);

■ A television documentary program may be divided into a number of video and audio segments. In some segments, the audio and video portions are of the same event such as when a person makes on camera remarks; and in others the audio portion may be a voice-over to a different visual portion. It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended. In studying a television program for possible defamatory meanings, a court must not confine its analysis to the words alone. The court must also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript. It is the entirety of the program, both audio and video, that must be considered in determining whether a television program is reasonably susceptible of a defamatory meaning.

In the instant case, Lasky appears on camera three times during the June 23, 1983 broadcast. The head of the school board whom Mundel sued for slander does not appear nor is she mentioned by name in the program. Thus, the words "she is a Communist" attributed to Lasky by Michael, who also appeared on camera, have a far greater impact on the viewer than words "she is a security risk" attributed to an unnamed school board member.

■ Although this court can discern at least two interpretations that are not defamatory as to the plaintiff, it cannot say that the defamatory one urged by the plaintiff is not reasonable. The program made clear that Mundel's dire misfortunes resulted from her being "Tagged as a Red". Lasky was the only person in the program said to use the word "Communist" in speaking of Mundel. The seminar at which Lasky was said to have done this was given a prominent place in the program. Lasky himself was given a prominent role in the broadcast with three combined video and audio segments. Finally, in the last segment in which he appears, Lasky was placed in the position of defending a charge that he was responsible for Mundel's downfall. Accordingly, this court holds that the broadcast is reasonably capable of the defamatory meaning attributed to it by the plaintiff.

### The Privilege of Neutral Reportage

The defendant claims that even if the program is capable of a defamatory meaning, it is protected by the privilege of neutral reportage.

This privilege was first articulated by Chief Judge Kaufman in *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). The court held that "when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." *Id.*, 556 F.2d at 120. "As would be natural in a case establishing a new principle, the *Edwards* opinion did not attempt precise definition of its contours. However, it did contain important suggestions that the privilege was limited in scope and required careful examination of the facts of each case." *Cianci v. New Times Pub. Co.*, *supra* at 68.

■ The privilege is a limited one. "[A] publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he

assumes responsibility for the underlying accusations." *Edwards, supra* at 120.

In *Cianci v. New Times Pub. Co., supra* at 70, the court stated that "[a]bsent the qualifications set forth by Chief Judge Kaufman in *Edwards,* all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability."

In *McManus v. Doubleday & Co., Inc.* Judge Weinfeld held investigative reporting to be beyond the protection of the privilege. The court stated:

> [s]ince there is no indication in the *Edwards* opinion that the neutral reportage privilege was meant to cover investigative reporting, and since including reports of such journalist-induced charges within the protection of the privilege is unnecessary for promoting the purpose of *Edwards,* the freer reporting of raging controversies, this court is constrained to find the defendant-author here unprotected by the privilege.

513 F.Supp. 1383, 1391 (S.D.N.Y.1981).

With these principles in mind, we turn to the defendant's claim of the neutral reportage privilege in this case. The privilege applies where there is an accurate and disinterested reporting of serious charges leveled by a responsible organization against a public figure under circumstances where a raging and newsworthy controversy exists. This is not such a case. Putting aside the issue of whether Newton Michael is a "responsible organization" and whether his statements are therefore within the scope of the privilege, the Court finds that here there was no reporting of a raging and newsworthy controversy. The program is a dramatized documentary in which the defendant pieces together a story of the evils of McCarthyism and its impact on two average Americans. In such a documentary, the depiction of Michael's recollection that Lasky called Mundel a Communist thirty years ago is not the kind of reportage that *Edwards* sought to protect. As in *McManus,* the defendant itself elicited the statement in question and no controversy raged around the statement until the defendant brought it about. Moreover, the statement was not a "charge", but a recollection in response to a reporter's question and any "controversy" was the creature, not the subject of defendant's reportage. In any case, whether the neutral reportage privilege allowed the defendant to report the Michael statement is not the issue. Michael's statement that *Lasky called her a Communist* is not the alleged defamation upon which the action is based.[3] The defamatory statement alleged here is that *Lasky caused Mundel's downfall by calling her a Communist.* This defamation, if proven, was not neutrally reported by defendant; defendant was its author. Indeed, the defendant does not argue that it neutrally reported this statement; it maintains that it never occurred. In sum, the underlying purpose behind the neutral reportage privilege—promoting the reporting of raging controversies—would not be served by its application in this case. Thus, the court holds the privilege to be inapplicable.

### Conclusion

The defendant's motion for summary judgment is denied in all respects.

So Ordered.

---

3. While this statement is alleged in the complaint, plaintiff's counsel at oral argument stated this allegation of defamation was being abandoned.