SOUTHERN AIR TRANSPORT, INC., Appellant/Cross–Appellee,

v.

AMERICAN BROADCASTING COMPANIES, INC., et al., Appellees/Cross–Appellants.

Nos. 88–7066, 88–7078.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1988.

Decided June 23, 1989.

---

1. Perhaps I have been too parsimonious.

David M. Kirstein, with whom Robert M. Beckman and Pierre Murphy, Washington, D.C., were on the brief, for appellant/cross-appellee Southern Air Transport, Inc.

Max O. Truitt, Jr., with whom John Payton and Stephen W. Preston, Washington, D.C., were on the brief, for appellees/cross-appellants ABC, Inc., et al.

Before MIKVA, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Southern Air Transport alleges that an American Broadcasting Companies television report created the false and defamatory impression that Southern Air had acted in partnership with the government of South Africa in an illegal operation to supply arms to insurrectionary forces in Nicaragua. The district court found that because all the statements regarding Southern Air in the challenged news story were true, it was not possible to infer a defamatory meaning from them.

While the applicable law holds that a defamatory inference may be derived from a factually accurate news report, we find that a viewer could not reasonably infer from the report that Southern Air was in partnership with South Africa. We also conclude that even though ABC had characterized the arms supply operation as illegal, that characterization is opinion protected by the First Amendment. We therefore affirm the district court's grant of summary judgment in favor of ABC and its reporter, Karen Burnes.

I. BACKGROUND

On February 25 and 26, 1987, appellee American Broadcasting Companies, Inc. ("ABC") aired two essentially identical versions of a special news report alleging U.S. and South African cooperation in support of a clandestine operation in Central America. According to the ABC story, U.S. government officials had enlisted the assistance of the South African government in supplying weapons to insurrectionary forces in Nicaragua known as the "Contras." The February 25 report was the lead story on ABC's "World News Tonight" and was introduced by anchorman Peter Jennings' statement that it would show

what lengths the Reagan Administration has gone to in order to help the ... Contras when Congress was against it. This is a story of how the South African government was enlisted to help the Contras with aircraft and flight crews.

A film clip of drilling soldiers beneath the phrase "South Africa Connection" accompanied Jennings' introduction.

The three minute, forty-five second story followed, beginning with more film of marching soldiers in camouflage. Appellee Karen Burnes, an ABC reporter, stated that ABC's investigation had revealed that during a period of intense congressional debate over economic sanctions against South Africa, Central Intelligence Director William Casey had run a "vest pocket operation" outside of all normal channels to enlist South African help for the Contras. A picture of Casey and a film clip of the debate accompanied this portion of the report. The story claimed that the CIA's Latin American Division Chief, Duane Clarridge, had secretly traveled to South Africa in 1983 in an attempt to solicit aid for the Contras. It continued:

Several months [after Clarridge's trip] Safair Freighter [("SAFAIR")], a South African cargo company, opened an office in the United States. U.S. officials said SAFAIR is involved in covert operations for the South African government. On the same day it incorporated SAFAIR signed a lease with Southern Air Transport [("Southern Air")], known for its past relationship with the [CIA]. SAFAIR provided planes to Southern Air, planes which were used to fly weapons to the Contras.

Footage of SAFAIR planes dissolving into a film of Southern Air planes accompanied this segment. Later in the story, Burnes reported that certain officials met with Southern Air pilots in a safe house in San Salvador, where they were told that third country nationals, some of whom were allegedly South African, would fly weapons into Nicaragua. A nearly identical story

aired on ABC's "Good Morning America" the next day.

On March 9, 1987, Southern Air initiated this libel action in the U.S. District Court for the District of Columbia, basing jurisdiction on the parties' diversity of citizenship. 28 U.S.C. § 1332(a)(1). Its complaint alleged that

> the report ... create[d] the false and defamatory impression ... that Southern Air leased airplanes from SAFAIR as an active and knowing participant in an illegal scheme established by the governments of the United States and South Africa for South Africa to assist in the delivery of weapons to the Contras.

Complaint, paras. 8 & 12. Southern Air also claimed that the "false and defamatory statement that Southern Air used SAFAIR planes to fly weapons to the [C]ontras was known by ... ABC to be false prior to ... the broadcast." Complaint, paras. 9 & 13. Southern Air sought more than $10,000 in actual damages and $30 million in punitive damages.

ABC moved to dismiss or, in the alternative, for summary judgment. In support of its motions, ABC set forth undisputed facts establishing that Southern Air played a role in airlifting arms to the Contras, but was unable at that time to show that Southern Air had used a SAFAIR plane for that purpose. The district court denied ABC's motions, stating that it could not say "beyond doubt" that viewers could not construe the challenged broadcast as containing a defamatory message. *Southern Air Transp., Inc. v. ABC*, 670 F.Supp. 38, 42 (D.D.C.1987) ("*Southern Air I*"). The court was not satisfied that "the juxtaposition of graphics and commentary could not convey the meaning ascribed to the broadcast" by Southern Air. *Id.*

The court further noted that it could not award summary judgment because of a dispute over several material facts, including whether Southern Air had used a SAFAIR plane in the Contra supply operation. The court observed that if a SAFAIR plane had been used to deliver weapons to the Contras, a reasonable inference might be drawn that Southern Air was in partnership with the South African government. *Id.* at 44.

During discovery, Southern Air's counsel informed ABC's counsel that he had ascertained that on one occasion a Southern Air charter flight had used a plane leased from SAFAIR to transport munitions from a Contra base at Ilopango, El Salvador to one at Aguacate, Honduras. Southern Air's president was on the flight and was aware that it had delivered the munitions.

Southern Air moved to amend its complaint, principally by deleting paragraphs 9 and 13, which alleged that the statement that SAFAIR planes were used to deliver weapons to the Contras was false and defamatory. ABC filed a renewed motion for summary judgment on the basis that the disclosure concerning the SAFAIR plane showed that the story was substantially true as it related to Southern Air. ABC also moved for the imposition of sanctions on Southern Air and its counsel pursuant to Fed.R.Civ.P. 11, claiming that at the time the complaint was filed, they knew or could have learned through reasonable inquiry that the allegations in paragraphs 9 and 13 were false.

In *Southern Air Transp., Inc. v. ABC*, 678 F.Supp. 8 (D.D.C.1988) ("*Southern Air II*"), the district court granted ABC's renewed motion for summary judgment. It noted that the dispute over the use of a SAFAIR plane was critical to its earlier determination to deny summary judgment. In the face of Southern Air's disclosure, the court concluded that "there is a reasonable inference that Southern Air played a role in deploying a South African airplane to supply weapons to the Contras," *id.* at 11, and that, because of the truth of the statements made, "it is impossible to infer defamatory meaning from them." *Id.* at 12. The court denied ABC's motion for Rule 11 sanctions. *Id.*

Southern Air appealed the grant of summary judgment, and ABC cross-appealed the denial of its motion for sanctions.

## II. DISCUSSION

### A. Was the Report Defamatory?

#### 1. *Applicable Legal Standards*

■ "In a libel case, it is the role of the court to determine whether the challenged

statement is 'capable of bearing a particular meaning' and whether 'that meaning is defamatory.' " *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C.Cir.) (en banc) (quoting *Restatement (Second) of Torts* § 614(i)), *cert. denied*, — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). If the court determines that the statement is capable of conveying a defamatory meaning, a jury must determine whether such a meaning was in fact attributed to it. *Id.* at 780. Our power to hold as a matter of law that a statement is not defamatory is limited:

> It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.

*McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 717 F.2d 1460, 1465 (D.C.Cir. 1983) (quoting *Levy v. American Mutual Liability Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964)).

Furthermore, District of Columbia law, which governs this diversity case, clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report:

> As to the falsity of the broadcast, appellant conceded in his deposition that both the WTOP–TV news broadcast and the film strip were accurate and true.... However, in determining whether the broadcast was defamatory in light of extrinsic facts, as appellant claims, the trial court must decide if the words (and herein, the accompanying film strip) are reasonably susceptible of or reasonably could be understood to have the meaning suggested by the innuendo.

*Harrison v. Washington Post Co.*, 391 A.2d 781, 783 (D.C.1978). Thus, even if all of ABC's factual statements regarding Southern Air are true, we must determine whether the challenged report nonetheless is capable of conveying the meaning alleged by Southern Air, and whether such a meaning is defamatory.

### 2. The Libels Alleged

■ The libels alleged by Southern Air initially consisted of two distinct claims:

the first asserts that ABC's story created "the false and defamatory impression" that Southern Air was "an active and knowing participant in an illegal scheme established by the governments of South Africa and the United States for South Africa to assist in the delivery of weapons to the Contras," Complaint, paras. 8 & 12; the second, that ABC falsely stated that Southern Air had made use of SAFAIR aircraft in making the deliveries. Complaint, paras. 9 & 13. In *Southern Air I*, the district court interpreted the first claim to allege both that viewers could infer that Southern Air was in effect "in bed" with the South African government and that Southern Air was involved in an illegal operation:

> While it is true that Southern Air Transport dealt commercially with a South African corporation, the Court finds that there is a substantial difference between economic dealings and innuendo that the plaintiff was in partnership with the government of South Africa. The Court is unwilling to hold, as a matter of law, that such an inference is unreasonable or could not lead to a finding of defamatory meaning. ... [P]laintiff [also] contends that the broadcast, in context, implies that Southern Air was involved in an illegal operation. The Court cannot say, as a matter of law, that a jury would not so find.

670 F.Supp. at 44.

In *Southern Air II*, however, the court stated that "[t]he possibility of a false innuendo that the plaintiff was in partnership with the government of South Africa arises *only* if the statement as to the use of SAFAIR planes is false." 678 F.Supp. at 10 (emphasis added). The court concluded that "[b]ecause of the truth of the statements made about Southern Air Transport in the ABC News broadcast, it is impossible to infer defamatory meaning from them." *Id.* at 12. The court did not discuss the alleged illegality of the operation.

The fact that Southern Air actually used a SAFAIR aircraft to transport arms to a Contra base is clearly relevant to Southern Air's claim that ABC falsely stated this fact, but we fail to see how it relates to the

reasonableness of an inference either that Southern Air was "in partnership with the government of South Africa," or that Southern Air was involved in an illegal operation. Because District of Columbia defamation law holds that a factually accurate broadcast may still be defamatory, *see Harrison,* 391 A.2d at 783, Southern Air's admission is not dispositive. Accordingly, we turn to the district court's original analysis, in *Southern Air I,* and its conclusion that it could not hold that a reasonable viewer could not infer either Southern Air's partnership with South Africa or its involvement in an illegal operation.

### 3. Partnership with South Africa

■ An inference that Southern Air was engaged in dealings with the government of South Africa clearly would have a defamatory meaning because of the intense antipathy felt by a great number of Americans towards South Africa. Given the numerous boycotts, protests, and sanctions that have taken place or been invoked against the government of South Africa and those associated or doing business with it, such an inference could cause Southern Air's reputation great damage and lead to other adverse consequences. *See, e.g.,* 131 Cong.Rec. S9,321–404 (daily ed. July 11, 1985) (Senate debate over the imposition of economic sanctions against South Africa). Therefore, we must determine whether this inference is reasonable.

■ In addressing this question, we are to consider the report "as a whole" and in the sense in which it would be understood by the average viewer. *Afro–American Publishing Co. v. Jaffe,* 366 F.2d 649, 655 (D.C.Cir.1966) (en banc). We must also take into account the impact of the visual effects as well as the text because "the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript." *Lasky v. ABC,* 631 F.Supp. 962, 970 (S.D.N.Y.1986); *see also Tavoulareas,* 817 F.2d at 779 ("entire context" of story must be considered). Only by considering the text in conjunction with the accompanying visual images can one understand the possible emotive impact of the story, as it is the juxtaposition of the audio and visual elements that conveys the meaning intended. *Lasky,* 631 F.Supp. at 970.

We conclude as a matter of law that a reasonable viewer could not infer from the report that Southern Air was in partnership with the government of South Africa. The text of the report focused on clandestine dealings between the CIA and the government of South Africa to secure the latter's assistance for the Contras in the context of congressional action urging tighter sanctions against South Africa and the cutoff of military assistance to the Contras. The report portrays CIA Director Casey, CIA Latin American Division Chief Duane Clarridge, and unnamed South African officials as the principals in these dealings. There is nothing in it to suggest that the "partnership" extended beyond the CIA and the South African government.

Southern Air is mentioned only briefly, and it is nowhere suggested it had any involvement in the discussions with South Africa. All the report states is that Southern Air was known to have had a past relationship with the CIA and that SAFAIR planes leased by it had been used to supply arms to the Contras. As the district court noted in *Southern Air I,* "there is a substantial difference between economic dealings [with SAFAIR] and innuendo that the plaintiff was in partnership with the government of South Africa." 670 F.Supp. at 44.

Nor does the visual portion of the report support the inference of such a partnership. Rather, it focuses on clandestine meetings that had allegedly occurred between United States and South African officials in support of the Contras and reminds the viewer that this operation took place in the face of congressional resistance. Thus, we see the phrase "South Africa Connection" emblazoned on top of a film clip of drilling soldiers in camouflage, a graphic illustrating Casey's alleged trip to South Africa with an inset picture of

him, films of congressional debate on South African economic sanctions, and military planes and helicopters on an unidentified airstrip. A Southern Air plane is shown only briefly and in the context of the supply operation alone. Considering the report "as a whole," and having viewed videotapes of the two broadcasts, we conclude that a reasonable viewer could not infer from the report that Southern Air was in partnership with the government of South Africa.

#### 4. *Illegal Operation*

■ Southern Air also alleged that the report portrayed it as a participant in an "illegal scheme ... to assist in the delivery of weapons to the [C]ontras." Complaint, paras. 8 & 12. As previously noted, the district court held in *Southern Air I* that it could not hold as a matter of law that a jury could not infer from the report that the operation to aid the Contras was illegal. 670 F.Supp. at 44. As Southern Air has previously noted, this issue relates to whether the scheme to aid the Contras was illegal, and not to Southern Air's alleged ties with South Africa. *See, e.g.,* Plaintiff's Reply Memorandum in Support of Plaintiff's Motions (July 7, 1987) at 9. If the report is capable of bearing this inference, we must determine whether the implication of illegality is opinion protected by the First Amendment.

In determining whether an allegedly defamatory statement is an expression of opinion rather than fact, a court will consider the totality of the circumstances, taking into account four factors. *Ollman v. Evans,* 750 F.2d 970, 979 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). First, does the language of the challenged statement have a precise core meaning or is it ambiguous? Viewers are more likely to treat ambiguous statements as opinion. Second, is the statement verifiable? If it cannot be readily verified, it is more likely an expression of opinion. Third, is the full context of the article or report such that it would

cause the average viewer to infer that a challenged statement is based on fact? Finally, is the broader context or setting such as to signal to the public that the statement is one of fact or opinion? A statement appearing in a political advertisement is less likely to be viewed as a statement of fact than one appearing in a report of the National Academy of Sciences.

Here, the introduction to the "Good Morning America" segment declared that the operation took place "even as U.S. military aid to the Nicaraguan rebels was prohibited by law." Under the first *Ollman* factor, this constitutes a precise statement that, standing alone, could suggest that ABC was stating as a fact that the operation was illegal. In view of the other *Ollman* factors, however, we conclude that this was an expression of opinion.

First, the immediate context is that of a political controversy not only over the issue of military aid to the Contras, but also over the reach of the various amendments placing restrictions on such aid that had been introduced by Congressman Edward P. Boland. The Reagan Administration had vigorously asserted that it had not violated the law. *See, e.g.,* Report of the Congressional Committees Investigating the Iran–Contra Affair, S.Rep. No. 216, H.R.Rep. No. 100–343, 100th Cong., 1st Sess. 395–410 (majority report), 489–99 (minority report). This context becomes apparent when we consider Peter Jennings' reference, in his introduction to the "World News Tonight" segment, to the impending release of a report by a special commission that had investigated the Iran–Contra affair and the fact that the ABC story was broadcast in the midst of highly publicized congressional hearings concerning the matter.

Second, given the controversy over the reach of the Boland amendments, the legality of the operation was not subject to ready verification short of recourse to a court of law. In light of this larger context, we do not believe that a statement that the operation was illegal can reasonably be taken as other than an expression

of ABC's opinion. As such, it is protected by the First Amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974) (opinion protected under First Amendment).

## B. Rule 11 Sanctions

■ The district court denied ABC's motion for Rule 11 sanctions without explanation in the last sentence of its opinion in *Southern Air II.* 678 F.Supp. at 12.

A court must impose Rule 11 sanctions on a party and his attorney if a "pleading, motion, or paper [signed by either] is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C.Cir.1985). Furthermore, Rule 11 imposes a duty on the signer of a pleading or paper to conduct a reasonable pre-filing inquiry into the relevant facts and law, and a court must impose sanctions if it determines no such inquiry took place. *See International Bhd. of Teamsters v. Association of Flight Attendants*, 864 F.2d 173, 176 (D.C.Cir.1988).

We accord the district court "wide discretion" in determining whether factual or bad faith reasons exist for the imposition of sanctions. *Westmoreland*, 770 F.2d at 1174. Thus, we will reverse such a determination only if we find an abuse of that discretion. Determinations of legal sufficiency, however, are questions of law, and as such are reviewable by this court *de novo. Id.* at 1175.

ABC filed its motion for sanctions subsequent to Southern Air's disclosure that a SAFAIR plane had indeed been used to ferry munitions from one Contra base to another, contrary to Southern Air's earlier assertions in its complaint and pleadings. ABC contended that Southern Air and its counsel knew, or with any reasonable inquiry would have learned, that these earlier assertions were untrue. Southern Air countered with a detailed description of its examination of flight logs and interviews with Southern Air executives, and it submitted an affidavit of its president, William G. Langton, explaining why he had failed to make earlier mention of the use of the SAFAIR plane. Affidavit of William G. Langton, November 6, 1987. The district court's weighing of this evidence involves factual questions that only warrant reversal if the district court abused its discretion. Although the court's denial of ABC's motion was "lamentably terse," *Adams v. Pan American World Airways, Inc.*, 828 F.2d 24, 32 (D.C.Cir.1987), *cert. denied sub nom. Union de Transports Aeriens v. Beckman*, —— U.S. ——, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988), we find no such abuse on the record before us and therefore decline to overturn the district court's ruling.

## III. CONCLUSION

We find that no reasonable viewer would infer from the televised report that Southern Air was in partnership with the government of South Africa in a scheme to provide aid to the Contras. We also conclude that any implication that Southern Air was involved in an illegal operation was an expression of opinion protected by the First Amendment. Accordingly, we affirm the district court's grant of summary judgment in favor of ABC. We also affirm the district court's denial of Rule 11 sanctions against Southern Air and its counsel.

*So ordered.*