# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――

Argued November 16, 2009       Decided January 29, 2010

No. 09-7044

MILAN JANKOVIC, ALSO KNOWN AS PHILIP ZEPTER,
APPELLANT

v.

INTERNATIONAL CRISIS GROUP, ET AL.,
APPELLEES

―――

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01198-RBW)

―――

*William T. O'Brien* argued the cause for appellant. With him on the briefs were *Lisa M. Norrett*, *John W. Lomas Jr.*, and *Malcolm I. Lewin*.

*Amy L. Neuhardt* argued the cause for appellee International Crisis Group. With her on the brief was *Jonathan L. Greenblatt*. *Neil H. Koslowe* entered an appearance.

Before: GINSBURG and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Milan Jankovic, also known as Philip Zepter, sued International Crisis Group and additional unnamed defendants Does 1 through 10 ("ICG," for the institution or for all defendants, as appropriate) for defamation, false light and intentional interference with business expectancy. The district court issued an order granting ICG's motion to dismiss (the "*Order*"), J.A. 1221-28 and Jankovic appeals. We reverse in part, affirm in part, and remand for additional proceedings.

* * *

Jankovic is the founder of Zepter Group, which provides "a wide range of products and services, including banking, insurance, telecommunications, and retail sales of consumer products." J.A. 20. ICG is a non-profit organization that describes itself as "working through field-based analysis and high-level advocacy to prevent and resolve deadly conflict." International Crisis Group, *Serbian Reform Stalls Again*, *ICG Balkans Report No. 145* at 30 (July 17, 2003) ("*Report 145*") J.A. 82-124. ICG's "reports and briefing papers are distributed widely by email and printed copy to officials in foreign ministries and international organisations and made generally available at the same time via the organisation's Internet site." *Id*. The language at issue in this case appears in ICG's *Report 145*, which addresses the deceleration of Serbian reforms—reforms initially spurred by the assassination of Premier Zoran Djindjic. We excerpt it below, numbering the sentences to assist discussion:

[1]  The unwillingness to continue the crackdown reflects the power of the Milosevic-era financial structures that – with the rigid oversight once provided by the dictator removed – have transformed themselves into a new Serbian oligarchy that finances many of the leading political parties and has tremendous influence over government decisions.  [2]  Some of the companies were originally formed as fronts by State Security or Army Counterintelligence (KOS), while others operated at the direct pleasure of the ruling couple.  [3]  Under Milosevic, many of these companies profited from special informal monopolies, as well as the use of privileged exchange rates.  [4]  In return, many of them financed the regime and its parallel structures.

[5]  Some of the individuals and companies are well known to average Serbs: Delta Holding (Milorad Miskovic), Karic (Bogoljub Karic), Pink (Zeljko Mitrovic), Zepter (Milan Jankovic, aka Filip Zepter), Kapital Banka (Djordje Nicovic), Toza Markovic (Dmitar Segrt), Progres (Mirko Marjanovic), Simpo (Dragan Tomic), Komercijalna Banka (Ljubomir Mihajlovic), Novokabel (Djordje Siradovic), Stanko Subotic, Dibek (Milan Beko), ABC (Radisav Rodic), Hemofarm (Miodrag Babic), AIK Banka Nis (Ljubisa Jovanovic) and Dijamant (Savo Knezevic) are but some of the most prominent.  [6]  Because of the support they gave to Milosevic and the parallel structures that characterised his regime, many of these individuals or companies have at one time or another been on EU visa ban lists, while others have had their assets frozen in Europe or the US.[80]

[7]  In the popular mind, they and their companies were associated with the Milosevic regime and benefited

from it directly. [8] The DOS campaign platform in September 2000 promised that crony companies and their owners would be forced to answer for past misdeeds. [9] Few of the Milosevic crony companies have been subjected to legal action, however. [10] The enforcement of the "extra-profit" law is often viewed as selective and there have been only a handful of instances in which back taxes, perhaps 65 million Euros worth, have been collected.[81] [11] Most disturbing is the public's perception that – at a time when the economy is worsening – these companies' positions of power, influence and access to public resources seem to have changed very little.

---

[80] http://europa.eu.int/index.eu.htm#;
http://www.treas.gov/offices/eotffc/ofac/sdn/index.html
[81] ICG interview with Finance Minister Djelic.

*Report 145* at 17.

Plaintiff initially alleged that the above passage (as well as two others in *Report 145*) contained defamatory statements, placed him in a false light, and intentionally interfered with his business expectancies. *Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165, 168-69 (D.D.C. 2006). The district court dismissed these claims, characterizing the passages as "not capable of defamatory meaning" and ruling that, as a result, they could not support either of the other claims. *Id*. at 179. In *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007), we reversed the district court's dismissal in part, finding that the passage excerpted above was susceptible of a defamatory reading. *Id*. at 1091.

Specifically, following the sequence laid out in *Moldea v. New York Times Co.* 15 F.3d 1137, 1142 (D.C. Cir. 1994) (*Moldea I*), we first found that, despite "numerous qualifiers," a reasonable reader could construe the passage as asserting "that Philip Zepter, personally, was a 'crony' of Milosevic who supported the regime in exchange for favorable treatment" and "that Philip Zepter was actively in alliance with Milosevic and his regime." *Jankovic*, 494 F.3d at 1091.

The understanding that *Report 145* accused Jankovic of "supporting" the Milosevic regime clearly derives from sentences 5 and 6 of the passage. Sentence 5 lists "Zepter (Milan Jankovic, aka Filip Zepter)" as belonging to the new Serbian oligarchy described in the first sentence. Sentence 6 imputes support of Milosevic ("and the parallel structures that characterised his regime") to those named in sentence 5. In addition, sentences 1 through 4 implied the quid pro quo feature that we identified ("in exchange for favorable treatment").

We note that sentences 2, 3, 4 and 6 use the pronouns "some" or "many," leaving open the possibility that readers of *Report 145* might not suppose that the companies and individuals named in sentence 5 were generally guilty of the conduct charged in sentences 2, 3, 4 and 6. But the prior panel, though recognizing that the passage contained a number of "qualifiers," *Jankovic*, 494 F.3d at 1091, could not have reached its interpretation unless it supposed that ordinary, reasonable readers could read the report as implying that those named in sentence 5 were guilty of supporting Milosevic and of receiving favorable treatment in exchange. Even if we disagreed with that understanding, which we do not, we are bound to it under the doctrine of law of the case. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en

banc) ("[T]he *same issue* presented a second time in the *same case* in the *same court* should lead to the *same result.*") (emphasis in original).

As to the defamatory quality of the assertions, we observed that "[m]erely associating somebody with a foreign government would not ordinarily be defamatory"; but, citing a case involving the apartheid regime of South Africa, we found that in this case the relationship asserted could be "sufficiently 'odious, infamous, or ridiculous'" to so qualify. *Jankovic*, 494 F.3d at 1091 (citing *Southern Air Transport, Inc. v. ABC, Inc.*, 877 F.2d 1010 (D.C. Cir.1989)). We remanded to the district court with instructions that it consider "the applicability and merits of . . . Opinion and Fair Comment Protection, the Fair Report Privilege, or the Neutral-Reportage Doctrine." *Id.*

On remand, ICG filed a motion seeking dismissal on grounds of opinion, fair comment, and fair report privilege. Jankovic opposed and also sought discovery on facts relating to the asserted defenses. The district court denied Jankovic's discovery motion and concluded that the passage was shielded by the fair report and fair comment privileges and protected as opinion. Holding that the passage was non-actionable, the district court dismissed all of Jankovic's claims. *Order* at 2. The court also held that the claim for intentional interference with business expectancy was inadequately pled. *Id.* at 6-7.

Jankovic now challenges all these rulings. We review the district court's dismissal *de novo*. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623-24 (D.C. Cir. 2001). While we affirm dismissal of the claim for intentional interference with business expectancy, we hold that none of the privileges or protections raised by ICG applies to the assertions that

Jankovic supported the Milosevic regime and that he received advantages in exchange. Accordingly, we remand the case for further proceedings on the claims for defamation and false light.

* * *

## A. The privileges and defenses

*Fair report*. Under applicable District of Columbia law, a defendant must "clear[] two major hurdles" to qualify for the fair report privilege. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. App. 1980). It must show, first, that its publication was a "fair and accurate report" of a qualified government source, and, second, that the publication properly attributed the statement to the official source. *Id*. See also *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985); *Prins v. Int'l Telephone & Telegraph Corp.*, 757 F. Supp. 87, 93 (D.D.C. 1991).

There are serious problems on the score of proper "attribution." The pertinent government source is referenced in footnote 80 of *Report 145*, which contains the Uniform Resource Locator ("URL") for an Office of Foreign Assets Control (OFAC) website: http://www.treas.gov/offices/eotffc/ ofac/sdn/index.html (last visited Dec. 22, 2009). The cited URL is currently non-functional: the Treasury's server returns an error message saying that it is not aware of the page.

ICG asserts that those who now access that URL will be "automatically transfer[red] to the now-current OFAC webpage regarding the Specially Designated Nationals ('SDN') List at http://www.treas.gov/offices/enforcement/ ofac/sdn/index.html" (last visited Dec. 22, 2009). ICG Br. at

32 n.18. Not only is that not correct, but this second OFAC URL is also non-functioning.

Whatever the efficacy of the URLs as such, ICG claims that footnote 80 adequately attributes the defamatory statements to the OFAC's frozen assets list for 1998, and to *Executive Order 13088: Blocking Property of the Governments of the Federal Republic of Yugoslavia (Serbia and Montenegro), the Republic of Serbia, and the Republic of Montenegro, and Prohibiting New Investment in the Republic of Serbia in Response to the Situation in Kosovo* (June 9, 1998), 63 Fed. Reg 32109 (the "*Executive Order*"). ICG Br. at 33; see also *id*. at 42. We will assume in ICG's favor that *Report 145* adequately leads the reader to either or both of these sources.

As we shall see, however, *Report 145* does not give a "fair and accurate" report of either of them. The apparent listing of Zepter Banka appears on page 40 of a 42-page single-spaced list that ICG offered to the district court as "a true and correct copy of the screen shot of SDN Changes 1998." J.A. 454, 576. At page 9 of this "screen shot" is a heading indicating that the names below (which include more than 100 banks) were added to the frozen assets list on June 18, 1998:

06/18/98: The following names have been added to the list of Specially Designated Nationals and Blocked Persons in connection with an Executive Order issued by President Clinton blocking property of the Governments of the Federal Republic of Yugoslavia (Serbia and Montenegro), the Republic of Serbia, and the Republic of Montenegro, and Prohibiting new investment in the Republic of Serbia in response to the situation in Kosovo.

J.A. 545.

This listing, standing alone, tells only that it occurred pursuant to the *Executive Order* and that the entities either were property of the Yugoslav, Serbian or Montenegrin governments or somehow had a role in enabling investment in the Republic of Serbia. Not a word suggests that Zepter Banka, let alone Phillip Zepter, *supported* the Milosevic regime or received advantages in exchange.

In the *Executive Order* itself, President Clinton ordered (with immaterial exceptions):

> [A]ll property and interests in property of the Governments of the Federal Republic of Yugoslavia (Serbia and Montenegro), the Republic of Serbia, and the Republic of Montenegro that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons . . . are hereby blocked.

63 Fed. Reg. at 32109, § 1(a). The order defines the "government of the Federal Republic of Yugoslavia (Serbia and Montenegro)" as

> the government of the Federal Republic of Yugoslavia (Serbia and Montenegro), its agencies, instrumentalities, and controlled entities, *including all financial institutions* and state-owned and socially owned entities organized or located in the Federal Republic of Yugoslavia (Serbia and Montenegro) as of June 9, 1998.

*Id*. § 5(e) (emphasis added). It similarly defines the governments of Serbia and Montenegro to include all financial institutions organized or located in those countries.

*Id*. §§ 5(f), 5(g).   These definitions are replicated in regulations of the Office of Foreign Assets Control of the Treasury Department.  31 C.F.R. §§ 586.306-308.

Later Treasury regulations explain:

These governments are defined in §§ 586.306 and 586.308 of the Regulations, respectively, and include "all financial institutions and state-owned and socially-owned entities organized or located" in the territories of the FRY (S&M) state and the Republic of Serbia, respectively, as well as "any persons acting or purporting to act for or on behalf of'" those governments.

64 Fed. Reg. 60660/3 (Nov. 8, 1999).

These definitions make it clear that the regulations treat *all* financial institutions as agencies, instrumentalities, or controlled entities of the governments of the various territories where they are organized or located.   As a financial institution, Zepter Banka would appear on the frozen assets list *whatever its relationship was to the Milosevic regime*, so long as it met either the locational or the organizational criterion.   Thus *Report 145*'s assertions that Zepter Banka gave "support" to Milosevic, and that its U.S. assets were frozen because of that support, are not fair or accurate reports of any government document ICG has identified.   Accordingly, the fair report privilege is of no use to ICG.

*Opinion, non-verifiable propositions*.   Although the parties direct arguments to whether ICG's assertions are "opinion," the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990), made clear that the First Amendment gives no protection to an assertion "sufficiently factual to be susceptible of being proved true or

false," *id.* at 21, *even if* the assertion is expressed by implication in "a statement of 'opinion,'" *id.* at 20. See also *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). (ICG does not suggest that liability under the law of the District of Columbia might (in this respect) be narrower than what the First Amendment allows.)

In finding non-verifiability, the district court focused on the word "crony," *Order* at 4-5, which we indeed used in our summary of *Report 145*'s relevant statements. But regardless of whether that epithet is verifiable standing alone, the question here is the verifiability of ICG's assertions that the plaintiff "gave" "support" to Milosevic (sentence 6), and that he gave support "in exchange for favorable treatment" (as the prior panel summarized the reasonably understood meaning of the relevant sentences, see 494 F.3d at 1091). To resolve the issue of "verifiability," we need not probe arcane matters of epistemology; both propositions are verifiable in the practical sense that our legal system is ready to make decisions on the basis of how such issues are resolved—decisions profoundly impacting people's lives.

As to "support," for example, the Supreme Court has upheld the authority of the executive branch to detain an individual, including a citizen, on a showing that he was (among other things) "'part of or *supporting* forces hostile to the United States or coalition partners.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (emphasis added). Similarly, whether support is offered in exchange for favorable treatment is analogous to the factual inquiry underlying the offense of bribery. See 18 U.S.C. § 201(b) ("Whoever . . . directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . with intent . . . to influence any official act . . . shall be fined . . . or imprisoned for not more

than fifteen years, or both."). If such points are verifiable enough to be the bases for prolonged detention, they are surely (at least in the potentially defamatory constructions understood by the prior panel) verifiable enough for defamation liability.

As part of its "opinion" argument, ICG says that the "factual basis for the connection between Zepter and the Milosevic regime that this Court held could be gleaned from [*Report 145*] is fully disclosed to the reader," and that therefore ICG should be immune under the doctrine that "a statement of opinion that is based upon true facts that are revealed to readers . . . [is] generally . . . not actionable so long as the opinion does not otherwise imply unstated defamatory facts." ICG Br. at 29 (quoting *Moldea I*, 15 F.3d at 1144-45). But as we explained above, the proposition that we said a reasonable reader could derive from *Report 145*— that Zepter supported the Milosevic regime or "the parallel structures that characterised his regime"—is based on ICG's assertions in sentences 5 and 6 that Zepter or Zepter Banka appeared on the frozen assets list *because of* support that was provided to Milosevic. Though Zepter Banka did appear on the frozen assets list, there is no evidence in the record that its appearance was based upon support for Milosevic, as opposed its simply being a financial institution in the region (and therefore automatically listed). Whether or not the defamatory reading of the passage constitutes an opinion, this aspect of *Moldea I* protects only opinions based on true facts, accurately disclosed. As ICG falsely stated the basis for the frozen assets lists, the doctrine is of no use to it. See *Milkovich*, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is

erroneous, the statement may still imply a false assertion of fact.").

ICG makes an additional somewhat muddled effort to pull the sting of *Report 145*. ICG Br. at 29-35. This portion of its brief appears to rely on the notion that authors of the report saved it from any defamatory character by sprinkling the pronouns "many" and "some" throughout its allegations. As we said earlier, that reading is inconsistent with the interpretation reached by the prior panel and is thus of no help to ICG.

*Fair comment*. ICG argues "fair comment" also as a free-standing doctrine under District of Columbia law (separately from its role in ICG's First Amendment non-verifiability defense). ICG Br. at 40-41. But a conclusion based on a misstatement of fact is not protected by the privilege. See *Washington Times Co. v. Bonner*, 86 F.2d 836, 841 n.4 (D.C. Cir. 1936) ("[T]he facts asserted as predicate of the fair comment must be true . . . ."). As we explained above, ICG here relies on the appearance of Zepter Banka on the frozen assets lists. Those lists, however, do not buttress accusations that Zepter Banka or Jankovic supported Milosevic or did so "in exchange for favorable treatment." Accordingly, the key passages of *Report 145* are not protected as fair comment.

In short, the excerpted passage is not protected as fair comment, fair report or opinion, whether for purposes of defamation, false light or intentional interference with business expectancy.

B. Intentional Interference with Business Expectancy

We have said that a plaintiff must plead, as necessary elements for a claim for intentional interference with business expectancy under District of Columbia law: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir.1995).

For the first element Jankovic appears to rely entirely on allegations of harm to his business generally. His complaint alleges, for example: "Plaintiffs' businesses have suffered a loss of current growth and business opportunities, a loss of future growth and business opportunities, and a loss of access to markets that otherwise would have been available, amounting to general damages in an amount to be proven at trial." Complaint ¶ 104.

But the first element of the tort, "a valid business relationship or expectancy," appears to require rather specific business opportunities (to be sure, however, not ones necessarily manifested in any contract). The cases invoked by the parties all revolve around relatively specific anticipated transactions: a prospective book deal, *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002); "three potential sources of prospective employment," *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 45 (D.D.C. 2009); development of a specific property in the District of Columbia, *Carr v. Brown*, 395 A.2d 79, 82-84 (D.C. 1978); opportunity to represent a trustee in a specific litigation, *Dem. State Comm. of D.C. v. Bebchick*, 706 A.2d 569 (D.C. 1998). See also *Laser Labs, Inc. v. ETL*

15

*Testing Labs., Inc.*, 29 F. Supp. 2d 21 (D. Mass. 1998) (dismissing a claim for intentional interference with business expectancy under Massachusetts law where plaintiff failed to allege interference with specific expectancies). The opportunities alleged by Jankovic, by contrast, appear to be simply the generic opportunities of any successful enterprise, a type of injury that can be protected by an award of damages in a successful defamation suit. See Robert D. Sack, Sack on Defamation, Libel, Slander and Related Problems § 10.5.1 (3d ed. 2009) (citing cases). Accordingly, we affirm the district court's dismissal of the business expectancy claim.


Conclusion

While we affirm the district court's dismissal of Jankovic's claim for intentional interference with a business expectancy, we reverse its dismissal of the remaining counts, and remand for proceedings consistent with this opinion.

*So ordered.*