NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0074n.06
Filed: January 31, 2005

No. 02-5022

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHARMAINE WEST and FIRST      )
ALTERNATIVE PROBATION      )
AND COUNSELING, INC.,      )
      )
    **Plaintiffs-Appellees,**    )    **ON APPEAL** FROM THE
      )    UNITED STATES DISTRICT
v.      )    COURT FOR THE EASTERN
      )    DISTRICT OF TENNESSEE
MEDIA GENERAL OPERATIONS,    )
INC. d/b/a WDEF-TV 12,      )
      )    **O P I N I O N**
    **Defendant-Appellant.**    )
_____)

**Before: DAUGHTREY and MOORE, Circuit Judges, and CALDWELL,[*] District Judge.**

**KAREN K. CALDWELL, District Judge.** Defendant-Appellant Media General

Operations, Inc., d/b/a WDEF-TV 12 (hereinafter "WDEF-TV") appeals from a jury verdict

awarding Plaintiffs-Appellees CharmaineWest and First Alternative Probation and Counseling,

Inc. ("APC") compensatory damages in an amount totaling $310,000 for defamation. During the

course of the trial, at least fourteen separate allegedly defamatory statements were identified.

Because we cannot discern from the general verdict form if the jury based its verdict on any of

these alleged defamatory statements, and because at least one of the alleged statements does not

meet the essential elements of defamation against public figures, we **REVERSE** and **REMAND**.

---

[*]The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting
by designation.

## I.  FACTUAL BACKGROUND

During the November 1999 television "sweeps" period, WDEF-TV in Hamilton County (Chattanooga), Tennessee, aired a four-part investigative series on an allegedly "pretty cozy relationship" between local general sessions court judges and First Alternative Probation and Counseling, Inc. (APC), a private, for-profit, probation counseling company.  APC, owned by Charmaine West, provided testing, screening, and counseling services to probationers convicted of misdemeanors in the Hamilton County general sessions courts.  Tennessee law allowed misdemeanants to be referred to such for-profit agencies, but relevant Tennessee statutes prohibited APC from charging more than a specified amount for supervisory activities.  *See* Tenn. Code Ann. § 40-35-303(i)(1).[1]  In November 1999, APC was the only provider of such services in the area.

WDEF-TV aired the four-part report on APC, titled "Probation for Sale," during the station's evening news broadcasts beginning on November 4, 1999.  Prior to its airing, the series was also extensively promoted by the station by use of clips of portions of the report calculated to pique the interest of the viewing public.  When the reports, entitled "Probation For Sale," were broadcast, viewers were informed that APC enjoyed "what some are calling [a] pretty cozy relationship with the judges in Sessions Court."  (J.A. at 462).  In order to aid an understanding of this court's review of the case below, a detailed review of the four-part broadcast follows.

*The First Televised Report*

The first aired report opened with the statement that a Hamilton County Commissioner (Curtis Adams) was calling for an investigation and a temporary shutdown of APC.  (J.A. at

_____

[1]Pursuant to Tenn. Code Ann. § 40-35-303(i)(2), additional costs could be imposed for counseling or treatment, "based on the defendant's ability to pay."

-3-

461). The news anchors explained how misdemeanor defendants were ordered to pay for and receive counseling as an alternative to jail, then posed the questions, "But does that freedom come at a cost? And what's the relationship between the Sessions Court and this private probation company [APC]?" (J.A. at 462). The anchors then turned the story over to investigative reporter Chris Willis, who stated that the Sessions Court "has an exclusive contract with this private probation company." *Id.* Willis further reported that "after an opinion from the State Attorney General" APC had become "the focus of a class action lawsuit." *Id.* The reporter went on to say that "we decided to take a closer look at [APC] and what some are calling their pretty cozy relationship with the judges in Sessions Court."

After explaining again how Sessions Court judges order misdemeanor offenders into counseling and how those defendants must pay for the counseling themselves, the reporter introduced an interview clip of a APC client by stating, "But those who've been there say APC is not about counseling; it's about cash." (J.A. at 463). The next clip showed APC client, James Clary, saying, "You come in, pay them the money, sit down, go to sleep, whatever you want to do, and when the hour is up, go home." *Id.*

The reporter repeated that "APC and Sessions Court are now in question after a recent opinion from the State Attorney General and a class action lawsuit." (J.A. at 463). At this point in the broadcast, a graphic of the following excerpt from the State Attorney General Opinion was shown: "If probation is ordered under Tenn. Code Ann § 40-35-303, a private probation service cannot collect any supervision fee above that established by the judge within the statutory limits." The reporter explained that the class action lawsuit alleged that APC was "operating illegally, charging defendants a lot more than the $35 a month limit allowed by state law."

According to the reporter, the lawsuit had also claimed that if defendants could not pay the fees charged, their probation would be revoked. During discussion of the class action suit, a graphic identified as excerpts of allegations from the lawsuit were shown.

The news report then showed a woman from the Public Defenders Office named Carla Gothard explaining that the defendants who do not pay the fee are not allowed to attend class, and are then reported for not attending class. (J.A. at 464).

After the Gothard clip, the reporter asked rhetorically, "So why, with the State Attorney General claiming it's unlawful, and with a class action lawsuit pending, did [names of five sessions court judges] send defendants to APC every month?" (J.A. at 464). The reporter did not specify what portion(s) of the State Attorney General's opinion supported such a characterization. At this point, the video briefly showed the graphic of the State Attorney General opinion excerpt quoted above, but then quickly covered that graphic with another graphic excerpt that simply stated: ". . . a private probation service cannot collect any supervision fee . . ."

Immediately after posing this question, the broadcast showed a video of Charmaine West. The reporter explained that she was the owner and operator of APC and claimed that "even though she's a private business woman, she has free rein [sic] in Sessions Court." (J.A. at 464). The report again showed Carla Gothard claiming that (presumably) West was frequently "in and out" of the courtrooms, hallways, judges' offices and ante rooms; used "their" computers; and was "sitting down and eating lunch with them." Gothard concluded, "It just appears to be too close of an association." (J.A. at 465).

The reporter further explained that "people who work in the courtroom every day" said

that gifts from West to the judges were "commonplace," including "catered meals and small gifts," and, according to Carla Gothard, "cakes or donuts." (J.A. at 465). Willis also claimed that West contributed to many judges' re-election campaigns. (J.A. at 465).

Immediately after listing these allegations, the report showed video of a man identified as "Hon. Steven Daniels [sic] – Court of Judiciary"[2] saying, "Bad idea." Viewers heard a reporter interviewing Judge Steven Daniel, who explained that "where there are users of the court system that are making gifts. Again, it's an appearance that by way of the gift, the special influence is available." (J.A. at 465-66).

The reporter then explained that to find out how far "the Charmaine West relationship with Sessions Court extends . . . beyond the private hallways of the courthouse," WDEF-TV "followed" West to "her sunny vacation condo in Ft. Lauderdale, Florida." (J.A. at 466). The report then showed a clip of West reportedly "outside her condo at the Bermuda Club." The report then showed Sessions Court Judge Richard Holcomb and described him as West's "neighbor and vacationing buddy." The reporter (Willis) narrated more video clips from Florida, characterizing them as showing Holcomb "in and out of Charmaine West's condo"[3] and "fishing with her at a Florida lake." Willis further explained that Holcomb had sent West "thousands of dollars of business by ordering indigent offenders to pay counseling fees that the State Attorney General calls unlawful." The reporter then claimed that WDEF-TV obtained the "ownership manifesto" of the condominium complex: "Charmaine West is registered in Building 8, Unit

---

[2]WDEF-TV's broadcasts continually refer to Judge *Daniels*. However, the correct name of the presiding judge of the Tennessee Court of the Judiciary is Steven *Daniel*.

[3]The referenced video clip showed West and Holcomb going in two separate doors that appeared to be next to each other.

207. Sure enough, Judge Holcomb is listed as the owner right next door: Building 8, Unit 208." (J.A. at 466-67). The video at this point showed a blurred document identified as the "ownership manifesto" and then layered over it two alleged excerpts. One excerpt appeared to identify West as a "resident." The other excerpt identified Holcomb as an "owner."

Willis continued that he had shown the Florida footage to County Commissioner Curtis Adams. After playing a clip of Adams criticizing the appearance of a conflict of interest, Willis stated, "Commissioner Adams is not alone. The Honorable Steven Daniels [sic] is the presiding judge of the State Court of the Judiciary. He's the man who makes sure every judge in Tennessee follows the Code of Judicial Conduct. And this, he says, is a bad example." The report showed Daniel discussing how "[j]udges are judges 24 hours a day." The report then cut back to a clip of Commissioner Adams calling for an investigation. (J.A. at 467-68).

Willis concluded the report by discussing attempts to get interviews with the sessions court judges and reading letters from the judges in response. At the very end of the broadcast report, Willis stated, "[O]nly after [sic] today, after months of trying to get an interview with APC, did we hear from them." (J.A. at 469).

*The Second Televised Report*[4]

The second report televised by WDEF-TV began with the anchors' set-up of the piece; after playing a clip of Charmaine West speaking to a reporter, the anchor opened, "The owner of a local probation company speaks out and says her relationship with the judges in Hamilton County Sessions Court is not unethical, nor a conflict of interest." (J.A. at 470). The anchors

---

[4]The parties appear to have provided a video tape of only the first of the four broadcasts as part of the Joint Appendix. However, the transcript of all four broadcasts were provided. From the record before us it appears that all four broadcasts were considered by the jury at trial in the district court below.

again explained the nature of APC's business, and added that "it seems to have cornered the market in Sessions Court." (J.A. at 470).

Willis's explanatory opening of his part of the report included the statement that "after a recent opinion from the State Attorney General, the company [APC] is now the focus of a class action lawsuit" and mentioned "allegations of excessive billing and unethical business practices." (J.A. at 471). Willis promised "a closer look at the exclusive contract" between APC and Sessions Court.

Willis again explained how misdemeanor defendants are frequently ordered to "pay for and receive counseling as an alternative to jail." The report then showed Carla Gothard commenting on how many indigent defendants find it difficult to pay the counseling fees. Willis stated, "It's that money for freedom condition that's led to a recent opinion from the State Attorney General." Willis then reminded viewers of the class action lawsuit by former APC clients. Former client James Clary was shown saying, "If I don't pay them, I'm going to go back to jail even though I'm doing everything right by going and everything." (J.A. at 472).

A few clips later, Willis stated that "in August of 1997, the judges turned an oral agreement into this written contract with APC, a deal Commissioner Adams calls ethically wrong, and a deal the State says is illegal." The report then showed Judge Daniel saying, "We don't do that kind of thing. I can't tell you of any situation where we on an individual basis contract with individuals." (J.A. at 473). Willis reminded viewers who Daniel was and stated that "he [Daniel] says this type of contract with a private business is wrong." Willis later explained that APC's contract with Sessions Court required APC to file a $1 million bond with the Court Clerk, but that the Court Clerk had told WDEF-TV that she was unaware whether or

not such a bond had been filed.

A couple of clips later, Willis repeated the prior night's allegations that West "has complete access to the court, roams the back hallways, uses the judges' offices and the computers. She comes and goes as she pleases and sits where she wants; in this case, on the bench." This statement was immediately followed by a clip of Judge Daniel stating, "The appearance of impropriety is reality to people in many cases." (J.A. at 474).

Willis continued, "But courtroom activity may not be the only appearance of impropriety. Judge Richard Holcomb owns a condominium in Florida right next door to APC's owner, Charmaine West. They vacation together, even spent time together with her family; in this case, fishing at a public lake in Ft. Lauderdale." (J.A. at 474-75).

Willis segued into the next portion of the report by asking, "So if APC is illegal, unethical, or money driven like many people claim, and if they can't produce the $1 million bond . . . why wouldn't someone else step in, open a probation company, and do it right?" (J.A. at 475). The report then discussed the unsuccessful effort of Bill Berry to launch a probation counseling business in Hamilton County. (J.A. at 475-76). The report emphasized Bill Berry's resume and qualifications for providing a counseling service, whereas Charmaine West's pre-APC education and background were never discussed at any point in the series.

Willis then discussed attempts to interview Sessions Court judges. Willis stated, "We've been trying to get an interview with her [West] since August. Today she granted our request, and when we finally sat down to talk, I asked her if she thought spending time with Judge Holcomb in Ft. Lauderdale created a conflict of interest with her for-profit probation company." (J.A. at 477-78).

The broadcast then showed Charmaine West stating, "I don't see it.  Because it does – it, you know, I can understand where people might think that, well, she's – I'm friends with everybody that I come – you know, with attorneys and everybody.  I mean, you know, if I hung out with you guys, I'd be friends with you, too.  But because you're reporters, are you going to give me any more publicity for free?  I don't think so.  I don't think you're capable of it."  (J.A. at 478).

Willis empathized that his request for an interview with West had stated that she would be given an opportunity to respond to everything.  Willis then stated on air that he had also received calls from former clients since the first televised report aired.  Willis concluded the broadcast by promising more of the West interview in the next aired report.  (J.A. at 478).

*The Third Televised Report*

The anchors introduced the third televised report by promoting the interview with Charmaine West.  (J.A. at 479).  In introducing the interview, reporter Chris Willis again stated, "[F]or months – actually since August – we have tried to sit down with Ms. West and for some reason or another we were unsuccessful.  But late last week she did agree to sit down with us on camera and respond to our investigative report and allegations stemming from a class action lawsuit."  (J.A. at 479).

The report then showed a clip of Charmaine West speaking about her relationship with the Sessions Court judges.  In between two of these clips, Willis claimed, "And now, in addition to a class action lawsuit, that relationship may be part of an FBI investigation."  (J.A. at 480).  After replaying the West clip quoted above, Willis repeated, "After months of trying to line up an interview. . . Charmaine West called in during a news talk radio broadcast on WGOW and

agreed to sit down with us." (J.A. at 481).

Willis introduced the next interview clip of West: "We asked her about a host of recent allegations, beginning with a class action lawsuit which claims she's charging defendants more than the $35 limit allowed by state law." Willis then asked West, "Is there an average cost?" West replied, "Thirty-five per month if they're on probation only. Now those that are receiving counseling, that is an additional cost. Those that receive counseling, I think all the programs are 20 per week. That's the cheapest drug and alcohol counseling you will find anywhere." (J.A. at 481).

Willis then narrated, "And while she claims it's the cheapest, her clients say you get what you pay for." The broadcast then showed a client named Ken Gupton criticizing the content of the counseling classes. Willis summarized Gupton's opinion that the counseling is "useless" and that the counselors are "rude and money driven." (J.A. at 482). Another Gupton clip was shown, followed by Willis stating, "Other clients say once they paid their money, they could sleep through the counseling classes. But Charmaine West also disputes that claim, sort of." The report then showed West saying that clients do not sleep through the counseling, though she cannot say as a matter of fact that no one ever has fallen asleep. (J.A. at 482-83).

Willis reminded viewers, "After an opinion from the State Attorney General, APC, the county, and the judges in Sessions Court are now facing a class action lawsuit." After more remarks by Willis about client referrals, the report showed West saying, "Well this year up until the lawsuit, we averaged probably 50 clients a month. After the lawsuit was filed, that dropped immediately." Willis then stated to the viewers, "Fifty clients a month. Either that's not true, or her own records are out of whack." (J.A. at 483). Willis continued, "News 12 has obtained a

-11-

quarterly report filed by APC, and the number of clients appears to be more than 50 a month. In fact, we checked March and April of this year, and it's more than double that." Willis then stated that Sessions Court ordered 129 clients to APC in March 1999 and 126 clients to APC in April 1999. (J.A. at 483).

Willis continued, "But Ms. West tells us she's not getting rich off the probation business." (J.A. at 483). The broadcast then showed West stating that her salary is $60,000 in "best year." Willis then stated to viewers that West believed that she came under fire after making an allegation against a judge. (J.A. at 484).

After Willis stated that West and her husband were not happy about coming under fire, the report showed West stating, "My husband is extremely resentful right now because it's as though I am keeping him up. He is a practicing attorney in Atlanta, and he comes from a wealthy family. And he's extremely upset about this." (J.A. at 484). Willis narrated to the viewers, "And that statement also is simply not true. Charmaine West's husband is not a practicing attorney in Atlanta. We checked with the State Bar Association and he's not even registered with the Georgia Bar. We also checked with the Tennessee Bar Association, and Charmaine West's husband was an attorney is Tennessee until he was disbarred for writing checks on a client's trust account." (J.A. at 484-85).

Willis then summarized a portion of West's response to "our video of her and Sessions Court Judge Richard Holcomb vacationing in Ft. Lauderdale, Florida." Willis stated, "She again pointed out even though her husband is listed in the phone book, her mother-in-law owns that condo. As for Judge Holcomb, she says she doesn't see a problem." The report then showed West saying, "I didn't go down there with them. I was there long before they got there. My

daughter – I took my daughter to visit her grandparents before she started school, and Karen and Richard Holcomb came down on their vacation. I don't see that as a problem." (J.A. at 485).

The next clip showed former client Gupton saying, "[I]t just stank from the beginning . . . and then you see on the news, you know, where the owner and the judge have a house next to each other in Florida. It's just -- to me, it's not right. Absolutely not right." (J.A. at 485). The broadcast showed one more clip of West saying, "I am not making millions of dollars as been accused of." (J.A. at 486).

Willis then stated, "This weekend it was reported that the FBI is conducting its own investigation with agents outside of the Chattanooga office, and the newspaper report says that that investigation reaches beyond the use of First Alternative Probation and Counseling." (J.A. at 486).

Willis then read a letter from four of the Sessions Court judges to all media outlets making the following nine points: (1) that "probation is not for sale in Hamilton County sessions court;" (2) "that to their knowledge no one has ever been sent to jail for failing to pay supervision or counseling fees;" (3) that "none of them have any financial or other interest in APC;" (4) that "probationers are assigned to service as a result of a plea bargain between the DA and the defendants," and the "judges just approve their joint decision;" (5) that "many of the agreements were negotiated by the Public Defender's Office;" (6) that "they have accepted no illegal gifts from any private counseling services, officers, or employees;" (7) that "no service, offices or employees enjoy special relationship with any judge," but they would review their contacts to "eliminate any appearance of a special relationship;" (8) that "no probationer or attorney has complained to us about the services of APC;" and (9) that they "will welcome and

-13-

cooperate with any FBI investigation of the General Sessions Court." (J.A. at 486-87).

Willis then read a faxed letter from the fifth Sessions Court judge who did not sign the previously discussed statement. According to Willis, Judge Robert Moon's letter stated, "Upon receiving three opinions from the State Attorney General, I ceased utilizing APC several months ago." According to Willis, Judge Moon's letter stated that Judge Moon immediately informed District Attorney Bill Cox of the AG's opinions, and neither Cox nor his assistants recommended APC in plea bargains. (J.A. at 488). With that, Willis concluded the report.

*Fourth Televised Report*

The fourth and final televised report at issue focused more on the courthouse and less on Charmaine West and APC than the prior three reports. The anchor introduced the report as "our continuing investigation into probation for sale." (J.A. at 489). She then stated, "Hamilton County District Attorney Bill Cox is now in the spotlight." She and Chris Willis reviewed the letter sent by the four Sessions Court Judges referenced above. Willis stated that the judges' "response comes on the heels of an exclusive News 12 investigation and this video, shot in Ft. Lauderdale, Florida, of Judge Richard Holcomb and the owner of APC, Charmaine West." (J.A. at 489-90). Willis stated that West, Holcomb and the three other judges said that West "does not have any special access to their offices." Willis then stated, "Many people, including the Presiding Judge of the State Court of the Judiciary, say if she did, it would be a conflict of interest because the probation company is a private, for-profit business, getting clients from Sessions Court." (J.A. at 490). This was a reference to Judge Steven Daniel's title.

Willis then stated, "But one of the judges from Sessions Court is missing from the memo sent from Sessions Court. . ." Willis then read portions of Judge Robert Moon's letter to District

-14-

Attorney Bill Cox in April 1999: "'Please be advised that I will no longer utilize the services of APC until a definitive determination can be made about the legality of charges for their services. Also, please refer to Tennessee Code Annotated 40-35-302, which requires APC to file written quarterly reports with the Hamilton County Criminal Court Clerk. To my knowledge,' he says, 'in the five years that APC has been used in the General Sessions Court, no quarterly reports have been filed.'" (J.A. at 490-91). Willis then reported that Judge Moon said that after he sent the letter to Cox, the DA stopped recommending the use of APC in plea bargains before him. (J.A. at 491).

Willis stated that he asked the county Commission chairman and the DA "if an investigation is in the works." The broadcast showed the Commission Chairman stating, "I would imagine he [Cox] would be reluctant since the FBI is already there. . . ." The report then showed District Attorney Cox saying, "There is very little that's happening in this jurisdiction I am not aware of, but I cannot comment on that at this time." (J.A. at 491). Willis then stated, "And whether or not the District Attorney Bill Cox does conduct the investigation, it's also reported that the FBI is looking into the operations of Sessions Court and the judges." (J.A. at 491).

The anchorwoman then asked Willis on air why Judge Moon and the other four judges "are not together on this one." Willis answered that "it boils down to a difference of opinion over the State Attorney General's opinion concerning private probation companies. Moon is not sending defendants to APC, and he hasn't since April. That's based on his interpretation of the State Attorney General. But the four other judges have a different take on that opinion, and they continue to send defendants to APC as recently as late last week." (J.A. at 492). The anchor

then concluded the segment.

## II.  PROCEDURAL BACKGROUND

Outraged by the "Probation for Sale" reports, West filed suit against WDEF-TV in Tennessee state court, raising state law claims of defamation, false light invasion of privacy, and invasion of privacy by intrusion upon seclusion or solitude.  Media General removed the dispute to federal court on basis of diversity jurisdiction.  (J.A. at 21-23).

*Allegations of Defamation in Plaintiffs' Complaint*

In the complaint (J.A. at 26-39), Plaintiffs alleged that the entire "Probation for Sale" series was "designed and intended to, and in fact did, present APC as an illegal business corrupting the justice system."  Complaint at ¶ 16.  Plaintiffs alleged that WDEF-TV used "various intentionally deceptive and misleading tactics to create a false impression of Plaintiffs among the viewing public."  Complaint at ¶ 17.  The Plaintiffs then proceeded to specify the following defamatory statements and the manner by which the statements were presented:

1.      Plaintiffs alleged that through the "contorted and distorted use of Judge Daniel's remarks," WDEF-TV "intentionally created the false impression that the Presiding Judge of the Court of the Judiciary was of the opinion that the General Session Court's use of APC services was improper and unethical."  Complaint at ¶ 18 (J.A. at 29).  Plaintiffs alleged that the interview with Judge Daniel was a "general teaching interview" for the purpose of explaining the general functions of the Court of the Judiciary.  Daniel was never asked about the Hamilton County Sessions Court or its use of APC's services, yet clips of the interview were presented in the "Probation for Sale" series as if he were responding directly to

-16-

the allegations concerning APC and Hamilton County's court system.

2. Plaintiffs alleged that by intentionally interchanging and exchanging "verbiage and unfounded allegations contained in a pending lawsuit" with language contained in an Attorney General Opinion about private probation supervision agencies, WDEF-TV intentionally and falsely implied that "the Attorney General had opined such agencies to be unlawful" when the opposite was true. Complaint at ¶ 19 (J.A. at 29-30). According to the complaint, the news reporter discussed the Attorney General's opinion while language from the civil lawsuit – "operating illegally" – was flashed up on the screen.

3. Plaintiffs claimed that by intentionally selecting abbreviated portions of an Attorney General opinion (No. 99-029) for display onscreen is a distorted fashion, WDEF-TV intentionally "misled the public into believing that for-profit probationary programs [such as APC] are illegal when they are both legal and beneficial." Complaint at ¶ 20 (JA at 30-31). According to the complaint, the following words from the opinion were shown onscreen: "a private service cannot collect a fee . . ." The full relative portion of the opinion, however, read as follows: "If probation is ordered under Tennessee Code Annotated § 40-35-303, a private probation service cannot collect any supervision fee above that established by the judge within the statutory limits. If the judge orders probation under § 40-35-313(a)(1), the judge may order additional payments by the probationer so long as the payments are reasonable."

4. Plaintiffs alleged that through language used by the reporter during the aired

reports, WDEF-TV intentionally caused the public to believe that APC was the subject of an FBI investigation "when it knew that to be false. . . . The FBI investigation [of the General Sessions Court] is of a completely different matter." Complaint at ¶ 21 (J.A. at 31).

5.      Plaintiffs claimed that through "diverse variants and the natural and ordinary meaning of and inferences from the words used," WDEF-TV falsely implied that Plaintiff West, who is married, had improper relationships with the General Sessions Judges, all of whom are married. Plaintiffs cited as examples the reports' statements that West had a "cozy relationship" with the judges, that she had "free reign" in Sessions Court, that her relationship with the judges extended beyond the "back hallways" of the courthouse, and that one of the judges, Judge Holcomb, was West's "vacationing buddy." Complaint at ¶ 22 (J.A. at 31-32).

6.      Plaintiffs alleged that to support the false claim that West and Judge Holcomb were "vacationing buddies," WDEF-TV purposefully showed footage of West and Holcomb together in a public park in Florida without showing additional footage indicating that Holcomb's wife was also present at the park. Complaint at ¶ 23 (J.A. at 32).

7.      Plaintiffs alleged that WDEF-TV also supported the "vacationing buddy" allegation by falsely reporting that Plaintiff West owned a condominium in Florida and was listed as a resident of a unit next to one owned by Judge Holcomb. Plaintiff West claimed that she did not own a condominium and that her mother-in-law was the owner and listed resident of the condominium in the

same complex in which Judge Holcomb's Florida condominium was located. Complaint at ¶ 25 (J.A. at 32-33).

8.     Plaintiffs claimed that WDEF-TV falsely reported that Plaintiff West "sat on the bench" during Sessions Court sessions.  Complaint at ¶ 26 (J.A. at 33).  Plaintiffs alleged that West was not sitting on the bench in the video clip shown by WDEF-TV to support the "sat on the bench" statement.  West claimed that she never sat on the bench.

9.     Plaintiffs alleged that WDEF-TV falsely broadcast that the judiciary "acted as a collection agency for APC and that probationers who could not pay APC were sent to jail."  Complaint at ¶ 27 (J.A. at 33).  Plaintiffs claimed that criminal defendants had probations revoked only for violating the terms of their probation, and that APC never refused to provide services to any individual who was unable to pay.

10.    Plaintiffs alleged that WDEF-TV falsely reported that Plaintiff West commonly gave gifts to the General Sessions judges, when the only so-called "gifts" were occasional baked goods shared with everyone.  Complaint at ¶ 28 (J.A. at 33).

11.    According to Plaintiffs, WDEF-TV failed to counter negative comments from two former APC clients with any positive comments from other former clients, and even "told one former client with a positive experience to keep quiet."  Complaint at ¶ 29 (J.A. at 33-34).

12.    Plaintiffs claimed that WDEF-TV falsely stated that it had been trying to conduct an interview with Plaintiff West since August 1999, when in fact it had never

attempted to obtain an interview with West during that time. Complaint at ¶ 30 (J.A. at 34).

13. According to Plaintiffs, when WDEF-TV finally did interview Plaintiff West, WDEF-TV selectively edited and distorted portions of the interview to make it appear that she had made claims and admissions that she had not actually made and that she had responded unbecomingly to questions she had never been asked. Complaint at ¶ 31 (J.A. at 34).

14. Plaintiffs alleged that WDEF-TV falsely stated that Plaintiff West lied during her interview concerning APC's average number of clients. Plaintiffs claimed that WDEF-TV should have explained the difference between "clients" and "referrals." Complaint at ¶ 32 (J.A. at 34).

15. Plaintiffs claimed that by the use and publication of the words described elsewhere in the complaint, WDEF-TV intentionally implied that Plaintiffs had wrongfully taken money, that APC was a corrupt business, and that West was a thief. Complaint at ¶ 33 (J.A. at 34-35).

16. Plaintiffs alleged that WDEF-TV's "Probation for Sale" series intentionally implied that Plaintiffs extorted illegal fees from its clients by use of fear. Complaint at ¶ 34 (J.A. at 35).

17. Plaintiffs claimed that WDEF-TV's "Probation for Sale" series intentionally implied that Plaintiffs unlawfully attempted to bribe the General Sessions court judges. Complaint at ¶ 35 (J.A. at 35).

18. Plaintiffs alleged that WDEF-TV led the public to believe "that Plaintiffs received

money without providing legitimate services" and falsely portrayed West as "tricky and dishonest in business dealings." Complaint at ¶ 41 (J.A. at 36).

19. Plaintiffs claimed that by use and publication of the words and meanings described elsewhere in the complaint, WDEF-TV intended to charge that Plaintiff West "had been guilty of having had unlawful sexual relations," "was of immoral and unchaste character," and was "a bad, unfaithful and adulterous person." Complaint at ¶ 42 (J.A. at 36).

Plaintiffs claimed in their complaint that the defamatory statements discredited Plaintiffs' lawful business, caused great injury to Plaintiff West's reputation for honesty, uprightness and truthfulness, exposed Plaintiff West to public wrath, hatred, contempt and ridcule and deprived her of public confidence. Plaintiff West also claimed that WDEF-TV's allegedly defamatory remarks caused her shock, mental suffering, shame, embarrassment and humiliation reasonably foreseeable by Defendant. Complaint at ¶¶ 37, 43-45.

*Finding that Plaintiffs are "Public Figures"*

Upon WDEF-TV's motion for summary judgment, the district court held that West and APC were limited-purpose public figures who were "required to prove that the defendants acted with actual malice regarding their claims for defamation" and false light invasion of privacy. Although West and APC still disagree with the lower court's holding, they have not sought to challenge the ruling on appeal. The district court denied the remainder of the WDEF-TV's motion for summary judgment, however, because it concluded that genuine issues of material fact remained to be resolved and thus denied, in part, the defendant's request for summary judgment. (J.A. at 77-78).

*Final Pretrial Order*

In a final pretrial order, the district court narrowed the defamation alleged by the plaintiffs to the following fourteen (14) defamatory statements or subjects:

- That private probation companies could not legally charge a fee for services as did Plaintiffs;
- That Plaintiffs were "operating illegally";
- That Plaintiffs had violated the law by failing to file a bond;
- That Plaintiffs were the subject of an FBI investigation;
- That Plaintiff West had a "cozy" relationship with the judges;
- That Plaintiff West routinely provided gifts to the judges, which activity was known to be unethical;
- That Plaintiff West was Judge Holcomb's vacationing buddy;
- That Plaintiff West and Judge Holcomb owned vacation condominiums together;
- That Plaintiffs bribed the Court (which claim was created through the visual image of hands counting out money and the use of the title "Probation for Sale);
— That Plaintiffs' relationship with the judges extended beyond the back hallways;
- That Plaintiff routinely sat on the bench;
- That Plaintiffs used the Courts as a collection agency, and that probation[er]s who were unable to pay were sent to jail;
- That Plaintiff West had long avoided interviews;
- That Plaintiff lied in an interview.

(J.A. at 57-58). Additionally, the district court allowed the presentation of evidence at trial on whether statements that probationers slept in APC classes and that APC had an "exclusive contract" with the sessions courts met the legal standards for defamation.

*Presentation of Defamatory Statements to Jury*

Despite the concise list of defamatory statements in the district court's pretrial order, the defamatory statements/topics alleged by the Plaintiffs were not presented to the jury in the same concise manner. In his closing arguments at trial, the attorney for Plaintiffs told the jury he intended to "point out to [the jury] 30 false statements." (J.A. at 392). Counsel then proceeded to

read aloud every statement from the broadcast transcript that he characterized as misstatement.[5] (J.A. at 396-99). When counsel ran out of time, he concluded, "I will do this, in the interest of time, I will suggest to you that if you care to go through the transcript another time you can find very easy [sic] 30 false statements." (J.A. at 399).

The concise list of the defamatory statements or topics was not presented to the jury by the district court through either its jury instructions or a special verdict form or interrogatories. *See* Jury Charge (J.A. at 401-28). Defendant WDEF-TV objected to the use of a general verdict form at the final jury conference, but was overruled by the district court.[6] (J.A. at 388-89).

The trial jury determined that both West and APC had successfully established the elements of a claim of defamation against the defendant[7] (J.A. at 98-101), awarding West $190,000 and APC another $120,000. After the district court denied WDEF-TV's motion for judgment as a matter of law, *see West v. Media Gen. Operations, Inc.*, 250 F.Supp.2d 923 (E.D. Tenn. 2002) (J.A. at 117-53), the defendant perfected this appeal. (J.A. at 155-56).

### III.   JURISDICTION

The district court exercised jurisdiction over this matter pursuant to the provisions of 28

---

[5]An illustrative quote from counsel's closing argument: "It's all about the cash. Probation is for sale. We've heard many times that's not true from many people. We see her, it's a cozy relationship with the judges in sessions court. Well, Judge Holcomb certainly denied that, and Ms. West has denied that. . . . The state of Tennessee attorney general claims it's unlawful. They don't do that. They refuse to opine as to the situation in Chattanooga. . . . Gifts from Charmaine West to sessions judges are commonplace. That's been denied over and over again. They're occasional they're appropriate like a birthday gift. . . . How about this one, Judge Steve Daniel, bad idea. What was he talking about? It wasn't this case. Vacationing buddy of sessions court Judge Richard Holcomb. How many times have we heard from him and his wife who his real vacation buddy is. . . . News 12 obtained the ownership manifesto. There is no such thing. Chris Willis made that up." (J.A. at 397-98).

[6]In its memorandum supporting his denial of WDEF-TV's motion for judgment as matter of law and/or new trial, the district court noted that the special interrogatories proposed by the defendant were very confusing. Those particular tendered interrogatories were not discussed at the final jury conference. Rather, Defendant made a general objection to the use of a general verdict form. (J.A. at 388-89).

[7]The jury refused to find WDEF-TV liable on the two invasion of privacy claims. (J.A. at 98).

-23-

U.S.C. §§ 1332 and 1441.  This court's appellate jurisdiction is premised upon the provisions of 28 U.S.C. § 1291.

## IV.    DEFENDANT'S ASSIGNMENTS OF ERROR

Defendant WDEF-TV assigns the following errors on appeal: (1) the district court erred by not requiring the plaintiffs to specifically identify the language from the broadcast that was defamatory; (2) the district court erred by not requiring a special verdict or special interrogatories so that the jury could analyze each alleged defamatory statement separately to determine if each statement met all the elements necessary to find defamation of a public figure; and (3) the district court erred by failing to conduct a complete review of the record to determine whether any of the alleged defamatory statements alleged by plaintiffs met the essential elements of defamation against public figures.

## V.    LAW AND ANALYSIS

### A.  Standard to be Applied in Defamation Case

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964), the Supreme Court announced that in a libel suit brought by a public official the plaintiff must prove, by clear and convincing evidence, that the defendant acted with "actual malice" in order to impose liability. *See also Cobb v. Time, Inc.*, 278 F.3d 629, 636 (6th Cir.), *cert. denied*, 123 S.Ct. 77 (2002). Twenty-five years later, the Supreme Court recognized that "there is no question" that public *figures* are subject to the same standards in defamation suits as are public *officials*.  *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989).

Plaintiffs in this litigation do not agree with the district court's determination that they must be considered "public figures," but have not appealed that finding.  *See* Appellees' Br. at 2.

-24-

Consequently, the parties recognize that Plaintiffs' success in proving their defamation claim depends upon their ability to show not only that WDEF-TV published false statements about them during the broadcasts of "Probation For Sale," but also that Defendant made those allegedly false statements with "actual malice."

Because the inquiry into whether actual malice is present in a given situation is a question of law, this court must conduct an independent review of the record. *See Cobb,* 278 F.3d at 637 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984)). Credibility determinations made by the finders of fact, however, are examined only to ascertain whether they are clearly erroneous. *Cobb*, 278 F.3d at 637 (citing *Harte-Hanks*, 491 U.S. at 688).

**B.     Failure to Identify Defamatory Statements Verbatim**

Defendant alleges that the district court erred by not requiring the plaintiffs to identify "specifically which statements and words in the broadcast were allegedly defamatory." Appellant Brief at 34. Though stated as one assignment of error, Defendant's objection is actually twofold. The first part of Defendant's objection is that "the Complaint and Pre-trial Order did not adequately narrow the issues to be tried and created substantial confusion." Reply Brief at 28. The second part of WDEF-TV's objection is that "no definite list of alleged defamatory statements" was submitted to the jury. *Id*.

*1.     The Complaint and the Pretrial Order*

Defendant claims that by relying on general "subjects," "Plaintiffs failed to present properly to the jury what [WDEF-TV] actually stated," Appellant's Brief at 34, and that

Plaintiffs "attempted to try statements that were not even in the broadcast."[8]   Defendant suggests

that instead of the trial court devising a list of defamatory "topics," Plaintiffs should have

"marked the written transcript of the broadcast or designate the clips of video to which it

objected."  Reply Brief at 28.

When Defendant raised this argument with the district court below, the court responded

as follows:

> Why is it proper in the instant case for the plaintiffs to identify the
> defamatory statements in the form of topics in the final pretrial order rather than
> quoting the exact defamatory  words uttered by the defendant?  The answer lies in
> the nature of the medium that the defendant utilized to publish its defamatory
> statements – television.  The present case is different from the usual libel suit
> where written words are printed in a book, newspaper or magazine.  In
> defamation cases involving the mere publication of written statements, it is a
> relatively simple, straightforward task for a plaintiff to identify with absolute
> precision the exact words that are alleged to be defamatory.  However, in cases
> involving television broadcasts with a stream of audio and visual components
> interacting with each other, the plaintiffs' burden of identifying alleged
> defamatory words with absolute precision and exactitude is much more
> complicated and poses an especially difficult problem. . . .
>
> . . . In *Lasky v. American Broadcasting Companies, Inc.*, 631 F. Supp. 962
> (S.D.N.Y. 1986) . . . the district court correctly reasoned that television programs
> are divided into a number of video and audio segments.  In some segments, the
> audio and video are of the same event such as when a person makes a remark or
> statement on camera.  In other segments, the audio may be a "voice-over" to a
> different video or photograph.  "It is the juxtaposition of these varying segments
> into an audio and video mosaic that conveys the meaning or meanings intended."
> *Id.* at 970.  In reviewing a television broadcast for possible defamatory
> statements, a court and jury cannot confine their analysis to the words alone.  The
> court and jury are necessarily required to also consider the impact of the video
> portion of the program since the television medium offers the publisher the

---

[8]Defendant cites as an example Plaintiffs' allegation that the "Probation for Sale" series stated, in Plaintiffs' words, that "Plaintiff West and Judge Holcomb owned vacation condominiums together."  Defendant contends that the broadcast only made references such as "Charmaine West's condo," "her condo," and "that is her neighbor . . . Holcomb."  Defendant also cites Plaintiffs' allegation that the broadcast implied that "Plaintiff had long avoided interviews with [WDEF-TV]."  WDEF-TV contends that what it actually said was "we've been trying to get an interview with [West] since August . . . For months – actually since August – we have tried to sit down with Ms. West and for some reason or another we were unsuccessful."  Appellant's Brief at 34, n. 15.

opportunity, through visual presentation, to emphasize and convey ideas in ways
that cannot be ascertained from a mere reading of the words in a written
transcript.

. . .

. . . Although it is important, as in any defamation case, to focus on the words and
language published by the defendant, this should not be the only focal point to the
exclusion of other relevant facts and details.  The words must be viewed in their
proper context in juxtaposition to all of the audio and visual components of the
television broadcasts as a whole.  The defendant's defamatory words, standing
alone, cannot readily be identified in isolation without also considering the
accompanying visual images, the tone of voice of the announcer or reporter, along
with the combined audio and video editing effects.  If words are taken completely
out of the context of the audio and visual components of the television broadcasts
as a whole, then it would not constitute a satisfactorily accurate, effective method
for identifying televised statements and visual images which are alleged to have a
combined defamatory meaning.

*West*, 250 F.Supp.2d at 932-34.

We agree with the district court's thoughtful and concise analysis.  Under the

circumstances of the present case, the manner in which Plaintiffs alleged the specific defamatory

statements made by the Probation for Sale series both in their initial Complaint and in the district

court's later Pretrial Order[9] was sufficient for purposes of both pretrial preparation and, subject

to the court's required review under the *New York Times v. Sullivan* line of cases, submission to

the jury.  In order to allege defamation in a television broadcast, Plaintiffs are not limited *per se*,

as Defendant suggests, to the exact words used by Defendant on the broadcast.  Tennessee law

allows a claim for "defamation by implication," or "defamation *per quod*."  *See Memphis*

*Publishing Co. v. Nichols*,[10] 569 S.W.2d 412, 419-420 (Tenn. 1978); *Pate v. Service*

_____

[9]The district court's Pretrial Order stated it "shall supplant the pleadings."  Pretrial Order at 14 (J.A. at 67).

[10]In *Nichols*, a married couple (the Nicholses) brought a defamation suit after a newspaper published a report
stating that a woman had shot at her husband and Mrs. Nichols after the woman "arrived at the Nichols home and found
her husband there with Mrs. Nichols."  The newspaper report did not include the fact that Mr. Nichols and two others
were also at the Nichols' home at the time and all five persons were sitting and talking in the living room when the

*Merchandise Co., Inc.*, 959 S.W. 2d 569, 573-74 (Tenn. Ct. App. 1996); *Isbell v. Travis Electric Co.*, 2000 WL 1817252 at *6 (Tenn. Ct. App. 2000) ("Tennessee law recognized the doctrine of defamation by innuendo or implication in *Memphis Publ'g Co. v. Nichols*."). As the court in *Pate* explains:

> Although the classification of libel *per quod* has been eliminated in Tennessee, extrinsic facts may still be used to show the defamatory meaning of words that are not defamatory on their face. However, in such cases the words are said to require an innuendo – that is, a statement of circumstances which give to the words a signification and meaning which they do not have on their face, but which cannot enlarge, extend, or change the sense of the worlds. *Fry v. McCord Bros.*, 95 Tenn. 678, 685, 33 S.W. 568, 570 (1895). The extrinsic facts cannot be stretched to give the words a defamatory meaning that is not implied by the words. The literal truth or non-defamatory nature (without extrinsic facts) of the actual words used is not a defense. *Nichols*, 569 S.W.2d at 420. Words which are substantially true can nevertheless convey a false meaning whether intended by the speaker or not. The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener. *Id.* at 419-20. The determination of whether a published report is capable of a defamatory meaning is a question of law for the court. *Nichols*, 569 S.W. 2d at 419.

959 S.W. 2d at 574.

In order to answer the question of whether the meaning reasonably conveyed by a statement made in a television broadcast is reasonably understood in a defamatory sense, the video context in which the statement is made must also be examined. As the district court explained, "[a] television director or reporter can, in many subtle ways, alter the tone and meaning of an otherwise innocuous broadcast through audio and visual editing techniques." 250 F.Supp.2d at 933. The potential effect of such alterations is well summarized by another district court in *Corporate Training v. National Broadcasting Co.*, 868 F. Supp. 510, 507 (E.D.N.Y.

woman arrived. The Nicholses alleged that by not including that fact, the report as written defamed the Nicholses by implying that Mrs. Nichols was having an affair with the woman's husband. The court agreed that a reasonable reader would have presumed that defamatory meaning from the article. 569 S.W. 2d at 419.

-28-

1994):

> "[C]ourts should be sensitive to the possibility that a transcript which appears relatively mild on its face may actually be, when the total mix of creative ingredients are considered, highly toxic. Indeed, a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic audio accompaniment, can be devastating when packaged in the powerful television medium."

The view expressed by the district court below and the courts in *Lasky* and *Corporate Training* is

akin to our previous holding in *Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d

825, 840 (6th Cir. 1988), *aff'd*, 491 U.S. 657 (1989), which recognized that an appropriate

analysis of the defamatory nature of any publication requires that a reviewing court judge

> not only the plain text of the publication, but also the composition of the story; its syntex [sic] and context; its timing; the prominence the [publication was] accorded . . .; the neutral, positive or negative thrust of the [publication]; material factual omissions or distortions; the image of the subject that the publication seeks to project and all other facts that may reflect upon the [defendant's] intent and purpose to publicly disseminate the information of the [publication] in controversy. . . . [A court should be] always mindful of the caveat that *the words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the [viewer] to whom it is addressed.*

(Emphasis added).

The law cited above shows that a television news report can imply a defamatory

statement about the subject of the report through a combination of audio statements and visual

effects. Using the examples cited by Defendant WDEF-TV in its brief, it is thus possible to

prove that the "Probation for Sale" series implied that Holcomb and West "owned vacation

condominiums together" by pointing not only to the broadcast's references to "Charmaine

West's condo" or "her condo" and "her neighbor . . . Holcomb," but also to the reference to

Holcomb as West's "vacationing buddy," the reference to Holcomb going "in and out" of West's

condo, and the manner in which those statements were spoken on air.[11]  As for the alleged

implied statement that West had long avoided interviews, Plaintiffs can not only point to the

statements "we've been trying to get an interview with [West] since August . . . For months –

actually since August – we have tried to sit down with Ms. West and for some reason or another

we were unsuccessful," but also to these other statements:

  – "But late last week she did agree to sit down with us on camera and respond to our

investigative report and allegations stemming from a class action lawsuit."  (This immediately

followed the statement cited by WDEF-TV above.)

  – "[O]nly after [sic] today, after months of trying to get an interview with APC, did we

hear from them";

  – "We've been trying to get an interview with her [West] since August.  Today she

granted our request. . .";

  – "After months of trying to line up an interview. . . Charmaine West called in during a

news talk radio broadcast on WGOW and agreed to sit down with us."

A reasonable viewer hearing these statements would likely infer that Charmaine West

had long avoided interviews with WDEF-TV.

In short, a plaintiff alleging that a television news report made or implied a false

defamatory statement about her may prove that the broadcast indeed made the defamatory

statement by pointing to multiple statements and images in the report, so long as she does so

with sufficient specificity.   In their initial Complaint, Plaintiffs specifically detail various

---

[11]We recognize that plaintiff may use some of the same video clips and audio as evidence that the broadcast falsely implied that she was having an adulterous relationship with Judge Holcomb.  For the reasons stated infra, however, we decline to opine at this time as to whether a reasonable viewer would have leapt to that inference after watching the broadcast.

allegedly defamatory statements -- those stated outright on the broadcast and those implied through a combination of audio and video images. For example, Plaintiffs claim that Defendant knowingly made false statements about Judge Holcomb being West's "vacationing buddy" and about West "sitting on the bench" during court sessions. Plaintiffs also detailed instances in which the Defendant implicitly defamed Plaintiffs, such as when the Defendant combined audio and visual graphics to falsely imply that a private probation service could not collect fees.

We believe that, after discovery had proceeded, it was appropriate under the circumstances of this case for the district court to then distill the many allegations made by Plaintiffs into the list presented in the district court's pretrial order as Plaintiffs' theory of the case. Defendant has not presented any evidence that its defense in the case was prejudiced by this method.

2.      *Lack of submission of specific list of alleged defamatory statements to the jury*

We share Defendant's concern, however, that after the district court's effort to devise the list of defamatory statements stated or implied in the Probation for Sale series, "no definite list of alleged defamatory statements" was submitted to the jury[12], and the district court did not act to correct the suggestion by Plaintiffs' counsel in closing argument that "if you [the jury] care to go through the transcript another time you can find very easy [sic] 30 false statements." (J.A. at 399). This does appear to be, as Defendant characterizes it, a "carte blanche" invitation "to pick any statement in the entire four-part Probation for Sale series as being actionable." Reply Brief at 28.

Among the elements a public figure must prove in order to succeed on a defamation

---

[12]The list of the sixteen statements could easily have been provided to the jury as a jury instruction stating, "Plaintiffs' theory of the case is that the Probation for Sale series made the following false defamatory statements: . . ."

-31-

claim are (a) that the defendant communicated a statement about the public figure; (b) that the statement was defamatory; (c) the statement was false; and (d) the defendant communicated the defamatory statement with actual malice, i.e., knowing it was false or with a reckless disregard for its truthfulness. Restatement (Second) of Torts § 580A (1977); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978); *New York Times v. Sullivan*, 376 U.S. at 279-80. In cases alleging defamatory statements made in a newspaper or a magazine, it is easy for the plaintiff to identify the statements communicated by the defendant and then proceed to prove whether those statements were defamatory (which, as discussed above, would include looking at the context of the entire article in which the statement was made). However, in a television broadcast such as the "Probation for Sale" series, which made many different statements about Plaintiffs through a combination of audio and video clips, Plaintiffs have to present some evidence to prove that the broadcast made a particular statement before proceeding to prove whether that statement was false and capable of a defamatory meaning. Therefore, the failure to give the jury a list of the defamatory statements alleged by Plaintiffs in a such a case, combined with the use of a general verdict form as discussed below, gives this Court no guidance as to how the jury reached its decision that the "Probation for Sale" series defamed Plaintiffs with actual malice. Simply put, we cannot tell which statements the jury found to be made, false, defamatory, and made with actual malice. Moreover, the possibility exists that the jury may have based their verdict on a statement that Plaintiffs never even alleged was false or defamatory, by perceiving from the combination of audio and video clips in the broadcast a false statement on which Plaintiffs never presented evidence.

C.    **Use of a General Verdict Form**

Defendant WDEF-TV also objects to the district court's use of a general verdict form rather than a special verdict form or special interrogatories. At trial, Defendant initially proposed a list of special interrogatories that the district court found too confusing. *West*, 250 F.Supp.2d at 936. Given the district court's description of the proposed form as "not designed or structured to ask an individual set of questions about each separate defamatory statement," *id.*, we agree. At the final jury instruction conference, however, Defendant objected to the use of general verdict form without insisting on the use of its previously tendered special verdict form. (J.A. at 388-389).

Defendant contends that without the aid of a special verdict from or special interrogatories, it is impossible to determine whether the verdict, under First Amendment principles, is supported by the evidence. In response, Plaintiffs refer this court to the district court's rationale for its decision to use a general verdict form. Appellee Brief at 30. The district court defended its use of the general verdict form by noting that (a) the district court has broad discretion in deciding what kind of verdict form to use; (b) all of the statements in dispute were properly submitted to the jury because an objectively reasonably jury could find that each and every one of the statements was false, defamatory, and made by the Defendant with actual malice; and (c) even if one of the statements was erroneously submitted to the jury, the general verdict was still valid because under Tennessee law, a general verdict must be construed to be attributable to the theory or theories supported by sufficient evidence and submitted to the jury free from error. *West*, 250 F.Supp.2d at 935-938.

Under Fed.R.Civ.P. 49, as the district court correctly noted, the decision to use a general verdict form, a special verdict form, or a general verdict form with special interrogatories is

within the sound discretion of the trial court. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 465 (6th Cir. 1999). For reasons that will become obvious below, we decline to rule whether the district court's decision to use a general verdict in this case was an abuse of discretion.[13] We note, however, that despite the confusing instructions tendered by Defendant at trial, formulating a special verdict form or special interrogatories would have been a relatively simple task. In essence, such a form would list the statements that Plaintiffs alleged the broadcast made about them and that were allegedly false and defamatory, and then ask the jury to indicate whether Plaintiffs met their burden of proof on each element of defamation as to each alleged statement.

Despite the broad discretion of the trial court, this court has, on occasion, reversed a general verdict when one of several claims were submitted to the jury in error, and the reviewing court cannot determine whether the general verdict is based, in whole or in part, on the erroneously submitted claim. *See Doherty v. American Motors Corp.*, 728 F.2d 334, 344 (6th Cir. 1984) (citing *United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959)); *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 667 (6th Cir. 1993) (citing *Halecki*, 358 U.S. at 619; *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29-30 (1962); *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60 (1907); *Maryland v. Baldwin*, 112 U.S. 490 (1884)); *see also Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1058 (6th Cir. 1984); *Elder Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 147-48 (6th Cir. 1972); *Volasco Products Co. v. Lloyd A. Fry*

_____

[13]As discussed in *Workman*, there has been some debate within this Circuit as to whether the trial court's decision on which verdict form to use is subject to review under an abuse of discretion standard or reviewable at all. 165 F.3d at 465; *compare Bills v. Aseltine*, 52 F.3d 596, 605 (6th Cir. 1995) (reviewing for abuse of discretion) *with Jarrett v. Epperly*, 896 F.2d 1013, 1020-21 (6th Cir. 1990) (stating that the trial court's discretion in devising a jury verdict is ordinarily unreviewable). Generally, however, "matters that are committed to the sound discretion of the district court are reviewed by the court of appeals for abuse of discretion." *Workman*, 165 F.3d at 465.

*Roofing Co.*, 308 F.2d 383, 390 (6th Cir. 1962).

These prior cases dealt with actions under federal statutes. As the district court noted, in diversity cases this court has generally followed state laws allowing for general verdicts to stand even if one of the alternate theories of recovery submitted to the jury was in error, so long as there is sufficient evidence to support the verdict on one of the other theories submitted to the jury. *Adkins v. Ford Motor Co.*, 446 F.2d 1105, 1108 (6th Cir. 1971) ("Where jurisdiction is founded upon diversity of citizenship and state-created rights are sought to be enforced, this Court has consistently construed a general verdict as the state courts would."). Such a law exists in Tennessee under Tennessee Code Annotated §§ 20-9-502 and 20-9-503.[14] *See Tutton v. Patterson*, 714 S.W.2d 268, 271 (Tenn. 1986); *Alex v. Armstrong*, 385 S.W.2d 110, 115 (Tenn. 1964); *Anderson v. Mason,* 141 S.W.3d 634, 640 (Tenn. Ct. App. 2003); *see also Adkins*, 446 F.2d 1105 at 1108 (6th Cir. 1971); *Watts v. Mack Trucks, Inc.*, 491 F.2d 601, 602-03 (6th Cir. 1974); *Tracy v. Finn Equipment Co.*, 290 F.2d 498 (6th Cir. 1961).

However, none of the federal and Tennessee cases cited in the preceding paragraph, along with the others cited by the district court, involve defamation issues. They deal exclusively with state law issues such as personal injury or contract law. They do not involve state law issues subject to federal constitutional protections such as the defamation of a public figure alleged in this case. Our independent research, moreover, cannot find any case law from either Tennessee or this Circuit that has allowed a general verdict on multiple defamatory

---

[14]Those code sections provide as follows:
Section 20-9-502. *Verdict applied to good account.* --If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts.
Section 20-9-503. *Scope of general verdict.* --A general verdict, although it may not in terms answer every issue joined, is nevertheless held to embrace every issue, unless exception is taken at the term at which the verdict is rendered.

statements alleged by a public figure or public official to stand when one of the defamatory

statements should not have been submitted to the jury.

A number of other courts, however, have reversed general verdicts in multiple libel cases

when one of the alleged libelous statements was submitted to the jury in error.  In *Avins v. White*,

627 F.2d 637 (3d Cir. 1980)[15], the Third Circuit reversed a general verdict on plaintiff's

defamation claim where it concluded that two of the three alleged incidents of defamation were

submitted to the jury in error, because "there is the distinct possibility that if we affirm the jury's

verdict, we may do so on the basis of non-defamatory statements."  627 F.2d at 646.  In

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997), the First Circuit reversed

a general verdict where it found that at least one of the multiple defamatory claims had been

submitted to the jury in error.  127 F.3d at 134; *see also Simon v. Navon*, 71 F.3d 9, 19 (1st Cir.

1995) ("The jury's verdict did not specify the statements on which defamation liability was

premised, and our conclusion that the Cadot letter could not support the claim on this record

therefore requires a new trial on defamation.").

In the *New York Times v. Sullivan* line of cases, the Supreme Court has frequently

reversed a general verdict where it cannot discern whether the jury based its verdict on an

unconstitutional theory of recovery.  *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. at 284;

*Greenbelt Co-op Pub. Ass'n v. Bresler*, 398 U.S. 6, 11 (1970) ("For when it is impossible to

know, in view of the general verdict returned whether the jury imposed liability on a permissible

or an impermissible ground the judgment must be reversed and the case remanded.") (internal

quotations omitted).  While these reversals have primarily been based on erroneous jury

---

[15]This court cited *Avins* with approval in *Doherty*. 728 F.2d at 344 n.5.  The *Doherty* case, however, did not
involve a defamation claim, and did not discuss the defamation claim at issue in *Avins*.

instructions on the elements of defamation, we believe the principle should also apply in a

multiple defamatory statements case where the general verdict gives us no guidance as to

whether the jury found for the plaintiff on a constitutional or an unconstitutional claim of

defamation. Therefore, where multiple defamatory statements have been alleged against a public

figure or public official, and where a defendant's objection to a general verdict without special

interrogatories is overruled,[16] we will reverse only if our independent review of the evidence

reveals that one of the submitted alleged defamatory statements does not meet the standards for

actual malice and we cannot otherwise discern from the record on which statements the jury

based its verdict. To hold otherwise would essentially erode the protections afforded by the First

Amendment. Keeping this in mind, we now review the evidence to see if any of the alleged

statements do not meet the actual malice standard required by the First Amendment under the

*New York Times v. Sullivan* line of cases.

## D.      Independent Review of Actual Malice

As discussed above, in order to prove defamation, a public figure plaintiff must prove (1)

that the defendant communicated a statement about the public figure; (2) that the statement was

made or communicated to one or more persons other than the public figure plaintiff; (3) that the

statement was defamatory; (4) that persons other than the plaintiff heard or read the statement,

understood its defamatory meaning, and understood the statement referred to the plaintiff; (5)

that the statement was false; (6) that the plaintiff was injured by the communication of the

statement by defendant; and (7) that the defendant communicated the defamatory statement with

---

[16]Other courts have questioned whether a general verdict should be reversed for an invalid claim when the defendant does not object to a general verdict form or does not request special verdict form or interrogatories. *See, e.g.*, *Davis v. Rennie*, 264 F.3d 86 (1st Cir. 2001). Because Defendant in this case objected to the use of the general verdict form at trial, we need not decide any "waiver" issues at this time.

actual malice, i.e., knowing it was false or with a reckless disregard for its truthfulness. Before

submitting a defamation claim to a jury, the trial court must decide whether there is sufficient

evidence for a jury to find for the plaintiff on all of these elements. Actual malice, moreover,

must be proven by clear and convincing evidence. When multiple defamatory statements or

matters are alleged, each element, including actual malice, must be proven as to each statement

or matter. We note, however, that the same items may be evidence of actual malice as to more

than one statement.

In *Cobb v. Time, Inc.*, this court explained the high threshold established by the "actual

malice" standard:

> The actual malice standard does not refer to a showing of ill will or malice
> in the ordinary sense. Rather, it requires that the plaintiff demonstrate that "the
> publication contains a false statement of fact which was made . . . with knowledge
> that the statement was false or with reckless disregard as to whether or not it was
> true." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667
> (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988)). *The fact that the
> defendant published the defamatory statement in order to increase profits is
> insufficient to prove actual malice. Harte-Hanks*, 491 U.S. at 667. Rather, a
> showing of actual malice requires at least a showing that the statements were
> made with a "reckless disregard for the truth." *Id.* A "reckless disregard for the
> truth" means that the defendant "must have made the false publication with a
> 'high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Garrison v.
> Louisiana*, 379 U.S. 64, 74 (1964)) (alteration in original). A failure to
> investigate before publishing, even when a reasonably prudent person would have
> done so, is not sufficient to establish reckless disregard. *Harte-Hanks*, 491 U.S.
> at 688. Instead, there must be "sufficient evidence to permit the conclusion that
> the defendant in fact entertained serious doubts as to the truth of his publication."
> *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Thus, the failure
> to investigate, alone, will not support a finding of actual malice, but the
> "purposeful avoidance of the truth" may do so. *Harte-Hanks*, 491 U.S. at 692. In
> a case in which a defendant is reporting a third party's allegations, the standard of
> reckless disregard may be met where "there are obvious reasons to doubt the
> veracity of the informant or the accuracy of his reports." *Id.* at 688 (quoting *St.
> Amant*, 390 U.S. at 732).

*Id.* at 637 (emphasis added).

Because no definitive list of the statements that Plaintiffs alleged were defamatory was provided to the jury, we are not even certain the jury verdict is based on one of the statements listed in the district court's pretrial order. Assuming *arguendo* that the statements in the pretrial order and the two additional topics added by the judge at trial after conclusion of the evidence were the only statements that the jury considered, we have determined that at least one of the statements was submitted in error because there was insufficient evidence that it was made with actual malice. Plaintiffs alleged that Defendant defamed them by stating or implying that APC was the subject of an FBI investigation. Plaintiffs claim that this was false, that an FBI investigation of the General Sessions Court at the time had nothing to do with the Sessions Court's relationship with APC.

Defendant did not mention an ongoing FBI investigation of the Sessions Court until the third report aired on Monday, November 8, 1999. The language used by the on-air reporter on that Monday night report was as follows: "And now, in addition to a class action lawsuit, that relationship may be part of an FBI investigation" (J.A. at 480); "This weekend it was reported that the FBI is conducting its own investigation with agents outside of the Chattanooga office, and the newspaper report says that that investigation reaches beyond the use of First Alternative Probation and Counseling." (J.A. at 486). Willis then read the statement made by the four sessions court judges just hours earlier, which discussed the allegations made by WDEF-TV about the relationship with APC and West. After concluding that discussion, the judges then stated that they "welcomed any FBI investigation."

At trial, Plaintiffs put forward testimony from WDEF-TV employee Faith Logan, who recalled a discussion of the FBI investigation among Willis and WDEF-TV producers:

Q: Okay. Did you have discussions with your bosses about who the FBI was, in fact, investigating, whether the FBI was investigating APC or Mrs. West or someone else?

A: It would have been David Goldberg, Chris Willis, Cathy Gugerty, myself, possibly even John Ryan, the executive producer, he was involved more on the tail end of producing it into the show because he was the executive producer and would have produced it. The discussion was very clear that – I mean, they knew that APC at the time was not being investigated. There was an FBI investigation of the general sessions court. In fact, that's how the story started was a story about general sessions court and the FBI –

Q: Do you remember –

A: – investigating that.

Q: Do you remember the judge's name that was being investigated?

A: Judge Moon.

(J.A. at 285-86). There is no indication in Logan's testimony, however, when this discussion of the FBI investigation took place – whether it was before any of the "Probation for Sale" series aired or whether it was the same day the third report was broadcast. This lack of evidence is critical because two days before the third broadcast aired, November 6, 1999,[17] the *Chattanooga Times and Free Press* published an article titled "Sessions Court is Probed by FBI." (J.A. at 435-36). The article stated, "For 18 months the FBI has investigated allegations and rumors surrounding the operation of Hamilton County General Sessions Court." The article reported, "Reliable sources say the probe has looked into complaints and rumors ranging from a report of misconduct involving a judge to whether prisoners were returned to court from [a workhouse] and may have had their sentences changed." The article then quoted a source as saying "There is a never-ending mill of rumors, allegations and complaints surrounding General Sessions Court activities. . . . I believe it is safe to say *the FBI is looking at everything*." (Emphasis added). The article then reported on WDEF-TV's ongoing series reports on the relationship between the

---

[17]The copy of the article provided to the court did not include a date. However, the court has confirmed through Lexis-Nexis that the article was published on November 6, 1999.

sessions court and APC., stating, "The FBI's investigation *is much broader than just a look at probation services*, sources said."  (Emphasis added).

Therefore, it appears that WDEF-TV did not broadcast any discussion of an FBI investigation until after the newspaper article was published.  Furthermore, Willis's discussion of the FBI investigation attributes the statement that the investigation went "beyond" the relationship with APC to the newspaper.  Willis's summary of the newspaper article on-air is supported by the "looking into everything" and "broader than just a look at probation services" statements attributed by the newspaper article to "sources."[18]

Plaintiffs contend in their brief that Defendant should not be able to hide behind the newspaper article because they had actual knowledge that the FBI investigation did not involve APC, pointing to Faith Logan's testimony.  However, we do not know from Logan's testimony whether this conversation took place before or after the newspaper published the article. Furthermore, the statement from the sessions court judges, issued just a few hours before the third broadcast aired, discussed the allegations regarding APC and then "welcomed" any FBI investigation.  (J.A. at 486-87).  This statement thus bolstered the suggestions in the newspaper article that the relationship with APC had become the subject of the FBI investigation. Therefore, there is no clear and convincing evidence that at the time Willis suggested an FBI investigation of APC on the November 8, 1999, broadcast, he or anyone else at WDEF-TV knew that the statement was false or had reckless disregard for the statement's truthfulness.

In other words, we cannot find that the statement that APC was the subject of an FBI investigation was made with actual malice.  Therefore, under *New York Times v. Sullivan*, the

[18]There is no evidence or allegation in the record before the Court that Willis or WDEF-TV contributed to the portions of the newspaper article discussing the FBI investigation.

-41-

statement should not have been submitted to the jury. Having found that the statement regarding the FBI investigation was submitted in error, and because there is no indication in the general verdict or the remainder of the record whether the jury based its verdict on any other statement alleged by Plaintiffs, we must reverse the verdict for Plaintiffs in this case and remand for a new trial on the defamation count.

Because we have found that the lack of evidence of actual malice as to the FBI investigation warrants reversal and remand to district court, and because the lack of a definite list of statements alleged by Plaintiffs makes it unclear what statements the jury actually considered during deliberations, we decline to review the remainder of the statements in the district court's pretrial order. On remand, however, the trial court should review the evidence to ensure that Plaintiffs meet their burden of proof as to each element of defamation on each statement alleged by the Plaintiffs. In order to aid future appellate review, we recommend that the trial court exercise its discretion under Federal Rule of Civil Procedure 49 and allow special interrogatories or a special verdict form in which the jury will be asked if Plaintiffs have proven the elements of defamation as to each alleged defamatory statement made by the "Probation for Sale" series. In her concurring opinion in *Tavoulareas v. Piro*, 817 F.2d 762, 808-09 (D.C. Cir. 1987), then-Judge Ginsburg recommended the use of special verdicts or special interrogatories as "a particularly useful check against the misconstruction or misapplication of a standard as uncommon as actual malice." Though special verdicts or special interrogatories are not necessary in all defamation cases, in a case such as the one before us involving a television broadcast capable of making many separate statements through the use of the same audio and video clips, we believe a special verdict or special interrogatories provide a useful check not

only against misconstruction of the actual malice standard, but also against a misunderstanding of Plaintiffs' allegations themselves.

The judgment of the district court is hereby **REVERSED AND REMANDED** for new trial in accordance with this opinion.